# Exhibit A

## No.

# In the Supreme Court of the United States

————

WILLIAM P. BARR, ATTORNEY GENERAL;
FEDERAL COMMUNICATIONS COMMISSION,
PETITIONERS

*v.*

AMERICAN ASSOCIATION OF POLITICAL
CONSULTANTS, INC., ET AL.

————

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT*

————

**PETITION FOR A WRIT OF CERTIORARI**

————

NOEL J. FRANCISCO
*Solicitor General
Counsel of Record*
JOSEPH H. HUNT
*Assistant Attorney General*
MALCOLM L. STEWART
*Deputy Solicitor General*
FREDERICK LIU
*Assistant to the Solicitor
General*
MARK B. STERN
MICHAEL S. RAAB
LINDSEY POWELL
*Attorneys*

*Department of Justice
Washington, D.C. 20530-0001
SupremeCtBriefs@usdoj.gov
(202) 514-2217*

## QUESTION PRESENTED

The Telephone Consumer Protection Act of 1991 (TCPA), Pub. L. No. 102-243, 105 Stat. 2394, generally prohibits the use of any "automatic telephone dialing system or an artificial or prerecorded voice" to "make any call" to "any telephone number assigned to a * * * cellular telephone service." 47 U.S.C. 227(b)(1)(A)(iii) (Supp. V 2017). The TCPA excepts from that automated-call restriction any "call made for emergency purposes or made with the prior express consent of the called party." *Ibid.* In 2015, Congress amended the TCPA to create an additional exception for calls "made solely to collect a debt owed to or guaranteed by the United States." *Ibid.*

Respondents wish to use an automatic telephone dialing system or an artificial or prerecorded voice to make calls to the cell phones of potential or registered voters to solicit political donations and to advise on political and governmental issues. First Am. Compl. ¶¶ 8-10, 12. The court of appeals held that the government-debt exception to the TCPA's automated-call restriction violates the First Amendment. The court further held that the proper remedy was to sever the government-debt exception, leaving the basic automated-call restriction in place. The question presented is as follows:

Whether the government-debt exception to the TCPA's automated-call restriction violates the First Amendment, and whether the proper remedy for any constitutional violation is to sever the exception from the remainder of the statute.

(I)

## PARTIES TO THE PROCEEDING

Petitioners (defendants-appellees below) are William P. Barr, in his official capacity as the Attorney General of the United States; and the Federal Communications Commission.

Respondents (plaintiffs-appellants below) are the American Association of Political Consultants, Inc.; the Democratic Party of Oregon, Inc.; Public Policy Polling, LLC; and the Washington State Democratic Central Committee.[*]

## RELATED PROCEEDINGS

United States District Court (E.D.N.C.):

*American Ass'n of Political Consultants, Inc.* v. *Sessions*, No. 16-cv-252 (Mar. 26, 2018)

United States Court of Appeals (4th Cir.):

*American Ass'n of Political Consultants, Inc.* v. *FCC*, No. 18-1588 (Apr. 24, 2019), petitions for reh'g denied, June 21, 2019

---

[*] Tea Party Forward PAC was named as a plaintiff in the First Amended Complaint, but withdrew as a party while the case was pending in the district court. D. Ct. Doc. 38, at 1 (July 11, 2017). It was not a "part[y] to the proceeding in the court whose judgment is sought to be reviewed." Sup. Ct. R. 12.6.

## TABLE OF CONTENTS

Page

Opinions below .................................................................. 1
Jurisdiction........................................................................ 2
Constitutional and statutory provisions involved.................... 2
Statement ......................................................................... 3
Reasons for granting the petition ....................................... 6
    A.  The court of appeals erred in invalidating the
        TCPA's government-debt exception .............................. 6
    B.  The question presented warrants this Court's
        review in this case ....................................................... 15
Conclusion ........................................................................ 18
Appendix A — Court of appeals opinion (Apr. 24, 2019) ...... 1a
Appendix B — District court order (Mar. 24, 2018) ........... 25a
Appendix C — District court order (Mar. 15, 2017) ........... 43a
Appendix D — Court of appeals order (June 21, 2019) ...... 49a
Appendix E — Statutory provisions.................................... 50a

## TABLE OF AUTHORITIES

Cases:

    *Ashcroft* v. *ACLU*, 542 U.S. 656 (2004) ............................... 15
    *Blodgett* v. *Holden*, 275 U.S. 142 (1927) ............................ 16
    *Bonin* v. *CBS Radio, Inc.*, No. 16-cv-674
        (E.D. Wis. Nov. 20, 2017) .................................................. 16
    *Campbell-Ewald Co.* v. *Gomez*, 136 S. Ct. 663 (2016) ........ 12
    *Duguid* v. *Facebook, Inc.*, 926 F.3d 1146
        (9th Cir. 2019), petition for cert. pending,
        No. 19-511 (filed Oct. 17, 2019) .............................. 13, 14, 16
    *Gallion* v. *Charter Commc'ns, Inc.*, 772 Fed. Appx.
        604 (9th Cir. 2019), petition for cert. pending,
        No. 19-575 (filed Nov. 1, 2019).................................... 16, 17
    *Gomez* v. *Campbell-Ewald Co.*, 768 F.3d 871 (9th Cir.
        2014), aff'd on other grounds, 136 S. Ct. 663 (2016) ........ 11

(III)

IV

Cases—Continued:                                                    Page

*Greenley* v. *Laborers' Int'l Union of N. Am.*,
    271 F. Supp. 3d 1128 (D. Minn. 2017) ............................... 16

*Holder* v. *Humanitarian Law Project*, 561 U.S. 1
    (2010).................................................................... 15

*Iancu* v. *Brunetti*, 139 S. Ct. 2294 (2019) ........................... 15

*Matal* v. *Tam*, 137 S. Ct. 1744 (2017)................................... 15

*Mejia* v. *Time Warner Cable, Inc.*, No. 15-cv-6445,
    2017 WL 3278926 (S.D.N.Y. Aug. 1, 2017) ..................... 16

*Milavetz, Gallop & Milavetz, P.A.* v. *United States*,
    559 U.S. 229 (2010)............................................... 10

*Moser* v. *FCC*, 46 F.3d 970 (9th Cir.), cert. denied,
    515 U.S. 1161 (1995)............................................... 11

*National Inst. of Family & Life Advocates* v.
    *Becerra*, 138 S. Ct. 2361 (2018)............................... 8

*Pleasant Grove City* v. *Summum*, 555 U.S. 460
    (2009).................................................................... 10

*Reed* v. *Town of Gilbert*, 135 S. Ct. 2218 (2015)................... 11

*Return Mail, Inc.* v. *United States Postal Serv.*,
    139 S. Ct. 1853 (2019) ............................................. 12

*Rostker* v. *Goldberg*, 453 U.S. 57 (1981) ............................. 16

*Schaevitz* v. *Braman Hyundai, Inc.*, No. 17-cv-23890
    (S.D. Fla. Mar. 25, 2019) ...................................... 16

*Sorrell* v. *IMS Health Inc.*, 564 U.S. 552 (2011)................... 7

*Spokeo, Inc.* v. *Robins*, 136 S. Ct. 1540 (2016)..................... 9

*United States* v. *Alvarez*, 567 U.S. 709 (2012) .................. 15

*United States* v. *Kebodeaux*, 570 U.S. 387 (2013) ............. 15

*United States* v. *Morrison*, 529 U.S. 598 (2000)................. 15

*United States* v. *Stevens*, 559 U.S. 460 (2010) ................... 15

*United States* v. *Williams*, 553 U.S. 285 (2008) ................ 15

*Walker* v. *Texas Div., Sons of Confederate Veterans,
    Inc.*, 135 S. Ct. 2239 (2015)................................... 10

V

Case—Continued:                                                    Page

*Williams-Yulee* v. *Florida Bar*, 135 S. Ct. 1656
(2015) ................................................................ 12, 13

Constitution and statutes:

U.S. Const. Amend. I ................................. *passim*
Free Speech Clause ........................................ 4
Bankruptcy Abuse Prevention and Consumer
Protection Act of 2005, Pub. L. No. 109-8,
119 Stat. 23 ...................................................... 10
11 U.S.C. 526(a)(4) ......................................... 10
Bipartisan Budget Act of 2015, Pub. L. No. 114-74,
Tit. III, 129 Stat. 588:
§ 301, 129 Stat. 588 ...................................... 3
§ 301(a)(1)(A), 129 Stat. 588 ........................ 4
Communications Act of 1934, 47 U.S.C. 151 *et seq.* ............. 5
47 U.S.C. 608 ................................................ 6
Fair Credit Reporting Act, 15 U.S.C. 1681 *et seq.* ............... 9
15 U.S.C. 1681b(b)(1) ...................................... 10
Fair Debt Collection Practices Act, 15 U.S.C. 1692
*et seq.* ............................................................... 8
15 U.S.C. 1692c(a) .......................................... 9
15 U.S.C. 1692c(a)(2) ...................................... 8
15 U.S.C. 1692c(a)(3) ...................................... 9
15 U.S.C. 1692f(7) ........................................... 9
Telephone Consumer Protection Act of 1991,
Pub. L. No. 102-243, 105 Stat. 2394 ................... 3
§ 2(6), 105 Stat. 2394 ..................................... 3
§ 2(10), 105 Stat. 2394 ................................... 3
§ 3(a) [§ 227(b)(1)(A)], 105 Stat. 2395-2396 ............... 3
§ 3(a) [§ 227(b)(1)(A)(iii)], 105 Stat. 2395-2396 ............. 3
47 U.S.C. 227(a)(1) ..................................... 3, 50a

VI

Statutes—Continued:                                      Page

47 U.S.C. 227(b)(1) (Supp. V 2017) ............... 2, 3, 12, 51a

47 U.S.C. 227(b)(1)(A) (Supp. V 2017).................. 11, 51a

47 U.S.C. 227(b)(1)(A)(iii)
  (Supp. V 2017) .......................................3, 4, 7, 10, 52a

47 U.S.C. 227(b)(1)(B) (Supp. V 2017).................... 8, 52a

Miscellaneous:

Office of Mgmt. & Budget, Exec. Office of the
  President, *Fiscal Year 2016:  Analytical
  Perspectives of the U.S. Government* (2015),
  https://go.usa.gov/xUtw2 .................................................. 13

# In the Supreme Court of the United States

––––––––––

No.

WILLIAM P. BARR, ATTORNEY GENERAL;
FEDERAL COMMUNICATIONS COMMISSION,
PETITIONERS

*v.*

AMERICAN ASSOCIATION OF POLITICAL
CONSULTANTS, INC., ET AL.

––––––––––

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT*

––––––––––

**PETITION FOR A WRIT OF CERTIORARI**

––––––––––

The Solicitor General, on behalf of the Attorney General of the United States and the Federal Communications Commission, respectfully petitions for a writ of certiorari to review the judgment of the United States Court of Appeals for the Fourth Circuit in this case.

**OPINIONS BELOW**

The opinion of the court of appeals (App., *infra*, 1a-24a) is reported at 923 F.3d 159.  The order of the district court granting the government's motion for summary judgment (App., *infra*, 25a-42a) is reported at 323 F. Supp. 3d 737.  The order of the district court denying the government's motion to dismiss (App., *infra*, 43a-48a) is not published in the Federal Supplement but is available at 2017 WL 1025808.

(1)

2

### JURISDICTION

The judgment of the court of appeals was entered on April 24, 2019. Petitions for rehearing were denied on June 21, 2019 (App., *infra*, 49a). On September 9, 2019, the Chief Justice extended the time within which to file a petition for a writ of certiorari to and including October 21, 2019. On October 15, 2019, the Chief Justice further extended the time to and including November 18, 2019. The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1).

### CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

The First Amendment to the Constitution provides in pertinent part that "Congress shall make no law  * * * abridging the freedom of speech." U.S. Const. Amend. I.

Section 227(b)(1) of Title 47 of the United States Code provides in pertinent part:

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—

(A)   to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—

* * * * *

(iii)   to any telephone number assigned to a  * * *  cellular telephone service  * * * , unless such call is made solely to collect a debt owed to or guaranteed by the United States.

3

47 U.S.C. 227(b)(1) (Supp. V 2017).  Other pertinent statutory provisions are reproduced in an appendix to this petition.  App., *infra*, 50a-59a.

### STATEMENT

1. Congress enacted the Telephone Consumer Protection Act of 1991 (TCPA), Pub. L. No. 102-243, 105 Stat. 2394, in light of evidence that consumers "consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy."  § 2(10), 105 Stat. 2394; see § 2(6), 105 Stat. 2394 ("Many consumers are outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers.").  Since its enactment, the TCPA has generally prohibited "any person within the United States" from "mak[ing] any call * * * using any automatic telephone dialing system or an artificial or prerecorded voice" to "any telephone number assigned to a * * * cellular telephone service." 47 U.S.C. 227(b)(1)(A)(iii) (Supp. V 2017); see TCPA § 3(a) [§ 227(b)(1)(A)(iii)], 105 Stat. 2395-2396.  That prohibition is referred to here as the "automated-call restriction."  For purposes of that restriction, the statute defines "automatic telephone dialing system" to mean "equipment which has the capacity * * * (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  47 U.S.C. 227(a)(1).

As originally enacted, the TCPA excepted from the automated-call restriction any "call made for emergency purposes or made with the prior express consent of the called party."  § 3(a) [§ 227(b)(1)(A)], 105 Stat. 2395-2396.  In 2015, Congress enacted an amendment to the TCPA entitled "debt collection improvements." Bipartisan Budget Act of 2015, Pub. L. No. 114-74, Tit.

4

III, § 301, 129 Stat. 588 (capitalization and emphasis omitted). That amendment created an additional exception to the automated-call restriction for calls "made solely to collect a debt owed to or guaranteed by the United States." § 301(a)(1)(A), 129 Stat. 588; see 47 U.S.C. 227(b)(1)(A)(iii) (Supp. V 2017). That exception is referred to here as the "government-debt exception."

2. Respondents are an association of political consultants and various political organizations. First Am. Compl. ¶¶ 8-10, 12. The members of the association, who include political fundraisers and pollsters, as well as the political organizations themselves, wish to call voters on their cell phones using automatic telephone dialing systems or artificial or prerecorded voices, for the purposes of soliciting political donations and advising on political and governmental issues. *Ibid.*

In 2016, respondents sued the Attorney General and the Federal Communications Commission in the Eastern District of North Carolina, alleging that the government-debt exception to the automated-call restriction effects an impermissible form of content-based discrimination, in violation of the Free Speech Clause of the First Amendment. First Am. Compl. ¶¶ 13-14, 36-63. Respondents sought a declaratory judgment that the automated-call restriction "on its face is unconstitutional," an injunction barring enforcement of the restriction, and nominal damages. *Id.* at 15.

The district court granted summary judgment in favor of the government. App., *infra*, 25a-42a. The court rejected respondents' claim that the TCPA violates the First Amendment. *Id.* at 32a-42a. Although the district court determined that the government-debt exception "makes content distinctions on its face," *id.* at 33a (citation omitted), the court concluded that the exception

5

survives strict scrutiny, *id.* at 35a-42a. The court explained that the "government-debt exception is a narrow exception that furthers a compelling interest"—namely, the "'federal government's interest in collecting debts owed to it'"—and that the exception "'does not do appreciable damage to the privacy interests underlying the TCPA.'" *Id.* at 37a-38a (citations omitted).

3. The court of appeals vacated the judgment of the district court and remanded the case for further proceedings. App., *infra*, 1a-24a.

The court of appeals agreed with the district court that the government-debt exception "facially distinguishes between phone calls on the basis of their content" and therefore is subject to strict scrutiny. App., *infra*, 12a. Unlike the district court, however, the court of appeals held that the government-debt exception "fails strict scrutiny review." *Id.* at 16a. The court concluded that the government-debt exception renders the automated-call restriction "fatally underinclusive" "by authorizing many of the intrusive calls that the automated call ban was enacted to prohibit," *ibid.*, and by "imped[ing] the privacy interests of the automated call ban," *id.* at 21a. The court therefore held that the government-debt exception "violates the Free Speech Clause." *Id.* at 22a.

Turning to the question of the appropriate remedy, the court of appeals directed that the government-debt exception be severed from the rest of the TCPA, leaving the automated-call restriction intact. App., *infra*, 24a. The court explained that its choice of severance as the appropriate remedy was supported both by the "general rule" favoring "'partial'" invalidation and by the severability provision set forth in the Communications Act of 1934, 47 U.S.C. 151 *et seq.*, of which the TCPA is

6

a part. App., *infra*, 23a (citation omitted); see 47 U.S.C. 608. The court also emphasized that the automated-call restriction had been "fully operative" for more than two decades before Congress enacted the government-debt exception. App., *infra*, 24a (citation omitted).

The court of appeals denied rehearing en banc. App., *infra*, 49a.

### REASONS FOR GRANTING THE PETITION

The court of appeals invalidated part of an Act of Congress, holding that the government-debt exception to the TCPA's restriction on automated calls violates the First Amendment. That holding is incorrect, and this Court usually grants review when a court of appeals has invalidated a provision of a federal statute. The Court should follow that course here.

### A. The Court Of Appeals Erred In Invalidating The TCPA's Government-Debt Exception

In holding that the government-debt exception to the TCPA's automated-call restriction violates the First Amendment, the court of appeals subjected the exception to strict scrutiny. App., *infra*, 15a. The court's application of strict scrutiny was unwarranted. Under the appropriate level of scrutiny, the government-debt exception is constitutional.

1. In holding that the government-debt exception is subject to strict scrutiny, the court of appeals stated that the exception "facially distinguishes between phone calls on the basis of their content." App., *infra*, 12a. The court was mistaken. The applicability of the government-debt exception does not depend on the content of the speech at issue. Rather, it depends on the call's economic purpose (*i.e.*, whether the call is "made

7

solely to collect a debt"), and on the existence of a spec-
ified economic relationship with the federal government
(*i.e.*, whether the debt is "owed to or guaranteed by the
United States").  47 U.S.C. 227(b)(1)(A)(iii) (Supp. V
2017); see *Sorrell* v. *IMS Health Inc.*, 564 U.S. 552, 567
(2011) (recognizing that "restrictions on protected ex-
pression are distinct from restrictions on economic ac-
tivity").

a.  The court below observed that, under the TCPA,
"a private debt collector could make two nearly identi-
cal automated calls to the same cell phone using prohib-
ited technology, with the sole distinction being that the
first call relates to a loan guaranteed by the federal gov-
ernment, while the second call concerns a commercial
loan with no government guarantee." App., *infra*, 13a.
The court noted that the TCPA would allow the first call
but not the second.  *Ibid*.  The court concluded from that
disparity that "[t]he legality of those phone calls, due
solely to the debt-collection exemption, thus depends on
their subject matter (i.e., their content)."  *Ibid*.

That conclusion does not follow.  The fact that a par-
ticular debt is owed to or guaranteed by the federal gov-
ernment may sometimes be apparent from the prere-
corded message on an automated call, but often that will
not be the case.  Thus, under the TCPA, a debt collector
could use an automated telephone dialing system to
send numerous debtors the prerecorded message "Please
pay up."  The applicability of the government-debt ex-
ception to a particular call would turn on whether the
recipient's debt was "owed to or guaranteed by the
United States," 47 U.S.C. 227(b)(1)(A)(iii) (Supp. V
2017), *i.e.*, on whether the requisite federal nexus *actu-
ally existed*, not on whether the prerecorded message
referred to that nexus.  Different calls having precisely

8

the same content thus would be treated differently under the statute depending on the precise nature of the economic activity in which the caller was engaged.

b. The government-debt exception does not extend to every automated call that is made to a person with a debt owed to or guaranteed by the government, but rather applies only to calls made "solely pursuant to the collection of" such a debt. 47 U.S.C. 227(b)(1)(B) ( Supp. V 2017); see pp. 13-14, *infra*. The fact that the exception is limited to calls made for a debt-collection purpose does not render the exception content-discriminatory. The words used in a particular call will often shed light on whether the call was made to collect a government-backed debt, rather than to achieve some other economic objective (such as to sell the debtor merchandise). But the use of a call's content as evidence of the type of economic activity involved is not the sort of content-based *restriction* that triggers strict scrutiny. The exception is still directed at the economic activity itself—not the words incidental to it. Cf. *National Inst. of Family & Life Advocates* v. *Becerra*, 138 S. Ct. 2361, 2373 (2018) ("[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech.") (brackets in original; citation omitted).

In this respect, the exception is no different from many other federal statutory provisions that are directed at particular types of economic activity. The Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. 1692 *et seq.*, for example, imposes a variety of restrictions on debt collectors when they are engaged in collecting debts. Among other things, the FDCPA makes it unlawful for a debt collector to communicate directly with a consumer represented by counsel, 15 U.S.C.

9

1692c(a)(2); to communicate with a consumer at the consumer's place of employment if the debt collector "knows or has reason to know that the consumer's employer prohibits" such workplace communications, 15 U.S.C. 1692c(a)(3); and to communicate with the consumer by postcard, 15 U.S.C. 1692f(7).

Those FDCPA restrictions do not apply to communications that are made for purposes other than debt collection. See, *e.g.*, 15 U.S.C. 1692c(a) (applying only to communications "in connection with the collection of any debt"). And in determining whether a particular FDCPA defendant acted with the relevant debt-collection purpose, a court would surely examine the content of the communications that were alleged to violate the statute. Yet no court has struck down those FDCPA provisions as content-based restrictions on speech. If a focus on debt-collection communications were treated as a form of content discrimination, however, the FDCPA would be subject to a potential First Amendment challenge. See D. Ct. Doc. No. 22-1, at 32, *Shadow* v. *Midland Credit Mgmt., Inc.*, No. 17-cv-2277 (S.D. Cal. June 6, 2019) (debt collector's motion for summary judgment asserting that the FDCPA discriminates based on viewpoint because it "regulate[s] the speech of debt collectors—speech attempting to collect a debt— but not the speech of debtors—speech *not* seeking to collect a debt").

Other federal statutes likewise regulate communications concerning discrete spheres of economic activity, yet they have not heretofore been viewed as content-based or subjected to strict scrutiny. The Fair Credit Reporting Act (FCRA), 15 U.S.C. 1681 *et seq.*, for instance, "imposes a host of requirements concerning the creation and use of consumer reports." *Spokeo, Inc.* v.

10

*Robins*, 136 S. Ct. 1540, 1545 (2016). Among other things, FCRA limits the circumstances in which "[a] consumer reporting agency may furnish a consumer report for employment purposes." 15 U.S.C. 1681b(b)(1). And the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23, "subjects debt relief agencies to a number of restrictions and requirements," *Milavetz, Gallop & Milavetz, P.A.* v. *United States*, 559 U.S. 229, 233 (2010), including the restriction that they shall not "advise an assisted person * * * to incur more debt in contemplation of" bankruptcy, 11 U.S.C. 526(a)(4).

Although those statutes regulate communications, they are directed at the economic activity of the persons involved. The fact that those laws are targeted at particular classes of economic actors and economic activities has not led courts to treat them as content-based restrictions on speech. Because the government-debt exception likewise turns on the nature of the economic activity that a particular call reflects, not on the content of speech, strict scrutiny is inappropriate here as well.

The nature of the particular economic activity that is encompassed by the government-debt exception reinforces that conclusion. That activity is not the collection of debts generally, but the collection of "debt owed to or guaranteed by the United States." 47 U.S.C. 227(b)(1)(A)(iii) (Supp. V 2017). And just as the federal government is largely unconstrained by the First Amendment when it engages in its own speech, see *Walker* v. *Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2246 (2015); *Pleasant Grove City* v. *Summum*, 555 U.S. 460, 467-468 (2009), the federal

11

government has a freer hand when it allows private parties to communicate with those who have a specified economic relationship with the federal government.

2. It appears to be uncontested in this case that the TCPA's basic automated-call restriction is not an unconstitutional abridgement of speech. By prohibiting the use of "any automatic telephone dialing system or an artificial or prerecorded voice" to make certain calls, 47 U.S.C. 227(b)(1)(A) (Supp. V 2017), the automated-call restriction regulates the manner of speech, not the content of it. Under the intermediate scrutiny that applies to content-neutral time, place, and manner restrictions, the basic automated-call restriction has long been understood to comport with First Amendment requirements. See, *e.g.*, *Gomez* v. *Campbell-Ewald Co.*, 768 F.3d 871, 876-877 (9th Cir. 2014), aff'd on other grounds, 136 S. Ct. 663 (2016); *Moser* v. *FCC*, 46 F.3d 970, 975 (9th Cir.), cert. denied, 515 U.S. 1161 (1995). That is because "the restriction of automated calling is narrowly tailored to" the government's "significant interest" in the "protection of privacy." *Gomez*, 768 F.3d at 876.

Because the government-debt exception is likewise content-neutral, Congress's amendment of the automated-call restriction to include that exception does not change the analysis. "[L]esser scrutiny" remains appropriate, and the statute satisfies that scrutiny. *Reed* v. *Town of Gilbert*, 135 S. Ct. 2218, 2232 (2015). In conducting that First Amendment review, moreover, the Court should be cognizant of the fact that the government-debt exception is not itself a *restriction* on speech, but an *exception* to the automated-call restriction. The government-debt exception further narrows the scope of the automated-call restriction by allowing the use of

12

automated-dialing technology for a specific class of calls. And "[i]t is always somewhat counterintuitive to argue that a law violates the First Amendment by abridging *too little* speech." *Williams-Yulee* v. *Florida Bar*, 135 S. Ct. 1656, 1668 (2015).

In some limited circumstances, "underinclusiveness can raise 'doubts about whether the government is in fact pursuing the interest it invokes,'" or about whether a law "actually advance[s]" that interest. *Williams-Yulee*, 135 S. Ct. at 1668 (citation omitted). But the government-debt exception raises no such concerns. The exception applies to a small fraction of the calls that are otherwise subject to the automated-call restriction, which continues to prevent millions of unwanted calls every day. And because it applies only to calls made to collect government-backed debt, it merely allows third parties to do what the federal government could do through its own personnel.

The federal government and its agencies are not "person[s]" subject to the automated-call restriction. 47 U.S.C. 227(b)(1) (Supp. V 2017); see *Campbell-Ewald Co.* v. *Gomez*, 136 S. Ct. 663, 672 (2016) ("The United States and its agencies, it is undisputed, are not subject to the TCPA's prohibitions."); cf. *Return Mail, Inc.* v. *United States Postal Serv.*, 139 S. Ct. 1853, 1861-1862 (2019) ("In the absence of an express statutory definition, the Court applies a 'longstanding interpretive presumption that "person" does not include the sovereign.'") (citation omitted). The calls that fall within the exception thus are calls that the TCPA has always permitted the federal government and its agencies to make using an automatic telephone dialing system or an artificial or prerecorded voice. The exception therefore

13

"does not do appreciable damage to the privacy interests underlying the TCPA." App., *infra*, 38a (citation omitted).

3. The government-debt exception advances a distinct and significant government interest in protecting the public fisc.  Estimates provided to Congress suggested that the exception could save the federal government $120 million over ten years.  See Office of Mgmt. & Budget, Exec. Office of the President, *Fiscal Year 2016: Analytical Perspectives of the U.S. Government* 127 tbl. 11-3, 128 (2015), https://go.usa.gov/xUtw2. Given the government-debt exception's narrow scope and distinct purpose, the exception "raises no fatal underinclusivity concerns." *Williams-Yulee*, 135 S. Ct. at 1668.

The court of appeals in *Duguid* v. *Facebook, Inc.*, 926 F.3d 1146 (9th Cir. 2019), petition for cert. pending, No. 19-511 (filed Oct. 17, 2019), acknowledged the government's interest in protecting the public fisc.  See *id.* at 1156.  The court stated, however, that Congress "could have accomplished the same goal in a content-neutral manner by basing the exception on the called party's preexisting relationship with the federal government," rather than on the content of the call.  *Ibid.* (citation and internal quotation marks omitted).

It is true that, if Congress had excepted from the TCPA's automated-call restriction *all* calls made to persons with debts owed to or guaranteed by the federal government, rather than simply calls made to collect those debts, the exception could not plausibly be viewed as content-discriminatory.  A broader exception of that sort, however, would deprive persons who owe government-backed debts of the TCPA's protection even from automated calls that are unrelated to those

14

debts and thus unrelated to the protection of the public fisc.  As applied to such calls, the exception would sacrifice consumer privacy without furthering the countervailing interest that prompted Congress to enact the government-debt exception.  There is no sound reason to fashion a First Amendment jurisprudence that would encourage Congress to regulate in that manner.

4.  After concluding that the government-debt exception violates the First Amendment, the court below held that the proper remedy is to sever the exception from the rest of the TCPA, leaving the automated-call restriction intact.  App., *infra*, 22a-24a.  That holding is correct and does not conflict with any decision of another court of appeals.  Indeed, the court of appeals in *Duguid* reached the same conclusion.  926 F.3d at 1156-1157.

The question whether the government-debt exception is severable from the rest of the TCPA therefore does not independently satisfy the usual criteria for this Court's review.  But if this Court determines that further review of the court of appeals' constitutional holding is warranted, it would be appropriate for the Court to consider the issue of the proper remedy for any First Amendment violation as part of that review.  The question presented in this petition accordingly encompasses the subsidiary question whether the appropriate remedy for any constitutional infirmity would be to sever the government-debt exception, rather than (as respondents argued below) to invalidate the TCPA's automated-call restriction.

That approach ensures that, if the Court grants review and affirms the Fourth Circuit's constitutional holding, it can decide the remedial issue and thereby obviate the need for further (and potentially extensive)

15

lower-court litigation of that question.  Granting certiorari on the question so formulated would also ensure that respondents retain a concrete stake in the outcome of the proceedings, since respondents can achieve their desired objective (*i.e.*, removing the current legal barrier to their use of automated-dialing technology for purposes *other than* the collection of government-backed debts) only if the Fourth Circuit's severability holding is reversed and the underlying automated-call restriction is held to be invalid.  Finally, the Court would have the option of addressing the severability issue first, and rejecting respondents' challenge to the automated-call restriction on the ground that the proper remedy for any constitutional infirmity in the government-debt exception would be to sever that exception.

### B.  The Question Presented Warrants This Court's Review In This Case

1.  "[W]hen a lower court has invalidated a federal statute," this Court's "usual" approach is to "grant[] certiorari."  *Iancu* v. *Brunetti*, 139 S. Ct. 2294, 2298 (2019); see, *e.g.*, *United States* v. *Kebodeaux*, 570 U.S. 387, 391 (2013); *United States* v. *Morrison*, 529 U.S. 598, 605 (2000).  The Court has done so repeatedly in cases presenting significant First Amendment questions, even in the absence of a circuit conflict.  See, *e.g.*, *Brunetti*, *supra*; *Matal* v. *Tam*, 137 S. Ct. 1744 (2017); *United States* v. *Alvarez*, 567 U.S. 709 (2012); *Holder* v. *Humanitarian Law Project*, 561 U.S. 1 (2010); *United States* v. *Stevens*, 559 U.S. 460 (2010); *United States* v. *Williams*, 553 U.S. 285 (2008); *Ashcroft* v. *ACLU*, 542 U.S. 656 (2004).  That practice is consistent with the Court's recognition that judging the constitutionality of a federal statute is "the gravest and most delicate duty

16

that th[e] Court is called upon to perform." *Rostker* v. *Goldberg*, 453 U.S. 57, 64 (1981) (quoting *Blodgett* v. *Holden*, 275 U.S. 142, 148 (1927) (opinion of Holmes, J.)).

The question presented has been and continues to be litigated across the country. Like the Fourth Circuit in this case, the Ninth Circuit has held that the government-debt exception violates the First Amendment and has severed the exception from the rest of the TCPA. See *Duguid*, 926 F.3d at 1152-1157; *Gallion* v. *Charter Comm'ns, Inc.*, 772 Fed. Appx. 604, 605 (9th Cir. 2019), petition for cert. pending, No. 19-575 (filed Nov. 1, 2019). Although no court of appeals has upheld the government-debt exception against a First Amendment challenge, various district courts have done so. See, *e.g.*, D. Ct. Doc. No. 62, at 17-21, *Schaevitz* v. *Braman Hyundai, Inc.*, No. 17-cv-23890 (S.D. Fla. Mar. 25, 2019); *Greenley* v. *Laborers' Int'l Union of N. Am.*, 271 F. Supp. 3d 1128, 1151 (D. Minn. 2017); D. Ct. Doc. No. 58, at 7-9, *Bonin* v. *CBS Radio, Inc.*, No. 16-cv-674 (E.D. Wis. Nov. 20, 2017); *Mejia* v. *Time Warner Cable, Inc.*, No. 15-cv-6445, 2017 WL 3278926, at *12-*17 (S.D.N.Y. Aug. 1, 2017).

2. Two other pending petitions for writs of certiorari—in *Facebook, Inc.* v. *Duguid*, No. 19-511 (filed Oct. 17, 2019) (19-511 Pet.), and in *Charter Communications, Inc.* v. *Gallion*, No. 19-575 (filed Nov. 1, 2019) (19-575 Pet.)—raise the same question as is presented here. See 19-511 Pet. at i (seeking review on the question "[w]hether the TCPA's prohibition on calls made using an [automatic telephone dialing system] is an unconstitutional restriction on speech, and if so whether the proper remedy is to broaden the prohibition to abridge more speech"); 19-575 Pet. at i-ii (similar).

17

The certiorari petition in *Duguid*, however, presents an additional question of statutory interpretation, regarding the scope of the TCPA's definition of "automatic telephone dialing system." See 19-511 Pet. at ii. As the petitioner in *Duguid* observes, resolution of that statutory question in its favor would render unnecessary any consideration of the First Amendment and severability questions in that case. See *id*. at 14 (explaining that consideration of the statutory question "will allow the Court to  * * *  potentially avoid the constitutional questions altogether"); C.A. Doc. 84, at 3, *Duguid* v. *Facebook, Inc.*, No. 17-15320 (9th Cir. Aug. 23, 2019) (noting that "resolution of either question could lead to dismissal of th[e] case"); see also 19-575 Pet. at 22 (arguing that the petition in *Duguid* "involves a threshold question of statutory interpretation that may prevent this Court from even reaching the constitutional question"). And the certiorari petition in *Gallion* seeks review of an unpublished memorandum disposition that merely applied the Ninth Circuit's holding in *Duguid*. *Gallion*, 772 Fed. Appx. at 605-606.

The certiorari petition in this case therefore provides the best vehicle for this Court's consideration of the First Amendment and severability questions. Unlike the certiorari petition in *Duguid*, this petition seeks review only of those questions, so granting review in this case would ensure that the questions are properly before this Court. And unlike the certiorari petition in *Gallion*, this petition seeks review of a published and fully reasoned court of appeals decision. For these reasons, the Court should grant the certiorari petition in this case, whether or not it also grants certiorari in *Duguid* or *Gallion*.

18

**CONCLUSION**

The petition for a writ of certiorari should be granted.

Respectfully submitted.

NOEL J. FRANCISCO
    *Solicitor General*
JOSEPH H. HUNT
    *Assistant Attorney General*
MALCOLM L. STEWART
    *Deputy Solicitor General*
FREDERICK LIU
    *Assistant to the Solicitor*
    *General*
MARK B. STERN
MICHAEL S. RAAB
LINDSEY POWELL
    *Attorneys*

NOVEMBER 2019

**APPENDIX A**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————

No. 18-1588

AMERICAN ASSOCIATION OF POLITICAL CONSULTANTS,
INC.; DEMOCRATIC PARTY OF OREGON, INC.;
PUBLIC POLICY POLLING, LLC; WASHINGTON STATE
DEMOCRATIC CENTRAL COMMITTEE,
PLAINTIFFS-APPELLANTS
AND
TEA PARTY FORWARD PAC, PLAINTIFF

*v.*

FEDERAL COMMUNICATIONS COMMISSION;
WILLIAM P. BARR, IN HIS OFFICIAL CAPACITY
AS ATTORNEY GENERAL OF THE UNITED STATES,
DEFENDANTS-APPELLEES

————————

Argued:   Dec. 12, 2018
Decided:   Apr. 24, 2019

————————

Appeal from the United States District Court for the
Eastern District of North Carolina, at Raleigh.
JAMES C. DEVER III, District Judge.   (5:16-cv-00252-D)

————————

Before:   KING, KEENAN, and QUATTLEBAUM, Circuit
Judges.

KING, Circuit Judge:

The American Association of Political Consultants,
Inc. and three other plaintiffs (hereinafter the "Plain-
tiffs") appeal from a summary judgment award made by

(1a)

2a

the district court to the defendants, the Federal Communications Commission (the "FCC") and the Attorney General (collectively the "Government"). *See Am. Ass'n of Political Consultants v. Sessions*, 323 F. Supp. 3d 737 (E.D.N.C. 2018) (the "Opinion").[1]   The Plaintiffs initiated this litigation in May 2016 in the Eastern District of North Carolina, alleging that part of the Telephone Consumer Protection Act of 1991 (the "TCPA") contravenes the Free Speech Clause of the First Amendment.   As pertinent here, the TCPA prohibits calls to cell phones by use of an automated dialing system or an artificial or prerecorded voice, subject to three statutory exemptions (the "automated call ban").   The Plaintiffs allege that one of the statutory exemptions to the automated call ban—created by a 2015 TCPA amendment—is facially unconstitutional under the Free Speech Clause.   That exemption authorizes automated calls that relate to the collection of debts owed to or guaranteed by the federal government (the "debt-collection exemption").[2]   According to the Plaintiffs, the free speech infirmity of the debt-collection exemption is not

---

[1]   In addition to the American Association of Political Consultants, Inc., the appellants here are the Democratic Party of Oregon, Inc., Public Policy Polling, LLC, and the Washington State Democratic Central Committee.   Those entities regularly engage in political activities, and many of those activities involve political communications and speech.   By way of example, the Plaintiffs conduct political polls, seek to persuade and inform voters, solicit donations, and organize voter-turnout efforts and town hall events.

[2]   As reflected above, we use the term "Government"—with a capital "G"—to collectively refer to the two named defendants.   On the other hand, we generally refer to the government of the United States by the generic term "federal government."

3a

severable from the automated call ban and renders the entire ban unconstitutional.

In awarding summary judgment to the Government in March 2018, the Opinion rejected the free speech challenge interposed by the Plaintiffs.   The district court applied strict scrutiny review to the debt-collection exemption and ruled that it does not violate the Free Speech Clause.   As explained below, we agree that strict scrutiny review applies in this case but conclude that the debt-collection exemption does not satisfy such a review. As a result, we agree with the Plaintiffs that the debt-collection exemption contravenes the Free Speech Clause.   In agreement with the Government, however, we are satisfied to sever the flawed exemption from the automated call ban.   We therefore vacate the judgment and remand.

I.

A.

Enacted in 1991, the TCPA was a response by Congress to the reactions of American consumers over intrusive and unwanted phone calls.   As a result of congressional concern with automated phone calls, the automated call ban prohibits phone calls to cell phones that use "any automatic telephone dialing system or an artificial prerecorded voice."   *See* 47 U.S.C. § 227(b)(1)(A).[3]   The automated call ban does not, how-

---

[3]  The automated call ban, which is codified at § 227(b)(1)(A) of Title 47, provides, in pertinent part, that it shall be unlawful for a person:

to make any call (other than a call made for emergency purposes or made with the prior express consent of the called

4a

ever, reach and prohibit all calls made with those tech-nologies.    For example, the TCPA authorizes auto-mated phone calls to cell phones if they satisfy one of the statutory exemptions specified in the automated call ban.    When it was enacted in 1991, the TCPA created two statutory exemptions to the ban, both of which are yet in effect.    Under the first exemption, if an auto-mated call to a cell phone is initiated "for emergency purposes," it does not contravene the automated call ban (the "emergency exemption").    *See id.*    Pursuant to the second statutory exemption, an automated call made to a cell phone with "the prior express consent of the called party" likewise does not violate the ban (the "con-sent exemption").    *See id.*

For more than twenty years, the emergency and con-sent exemptions were the only statutory exemptions to the automated call ban.    In 2015, however, Congress en-acted the third statutory exemption—the debt-collection exemption—and therein excepted from the ban all calls to cell phones "made solely to collect a debt owed to or guaranteed by the United States."    *See* Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 301(a), 129 Stat.

---

party) using any automatic telephone dialing system or an ar-tificial or prerecorded voice—

. . . .

(iii)   to any telephone number assigned to a   . . .   cellular telephone service   . . .   unless such call is made solely to col-lect a debt owed to or guaranteed by the United States.   . . .

*See* 47 U.S.C. § 227(b)(1)(A).   An "automatic telephone dialing sys-tem" is defined as equipment that "has the capacity (A) to store or produce telephone numbers to be called, using a random or sequen-tial number generator, and (B) to dial such numbers."   *See id.* § 227(a)(1).

5a

584, 588 (2015) (amending 47 U.S.C. § 227(b)(1)(A)(iii)).[4] In addition to the statutory exemptions, automated calls made by the federal government itself are not barred by the automated call ban. *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016) ("The United States and its agencies, it is undisputed, are not subject to the TCPA's prohibitions."). With the foregoing statutory framework in mind, we turn to the proceedings in the district court.

### B.

In May 2016, the Plaintiffs filed this lawsuit in the Eastern District of North Carolina, alleging, inter alia, that the debt-collection exemption to the automated call ban contravenes their free speech rights because it is a content-based restriction on speech that fails to satisfy strict scrutiny review. According to the complaint, the debt-collection exemption creates a regime that permits —and thereby unconstitutionally favors—a select group of otherwise prohibited automated calls to cell phones. The complaint also alleges that whether an automated phone call satisfies the debt-collection exemption, and thus escapes the prohibitions of the automated call ban, depends on the call's content. The Plaintiffs therefore allege that the debt-collection exemption to the ban contravenes the Free Speech Clause.

---

[4] In 1992, a year after its enactment of the TCPA, Congress empowered the FCC to create regulatory exemptions to the automated call ban. *See* Telephone Disclosure & Dispute Resolution Act, Pub. L. No. 102-556, § 402, 106 Stat. 4181, 4194-95 (1992) (codified in 47 U.S.C. § 227(b)(2)(C)). Utilizing that authority, the FCC has promulgated six regulatory exemptions, which were not challenged in the district court.

6a

In 2017, the Plaintiffs and the Government each moved in the district court for summary judgment. By its Opinion of March 26, 2018, the court denied the summary judgment request of the Plaintiffs and awarded summary judgment to the Government. In so ruling, the court rejected the Free Speech Clause challenge of the Plaintiffs. At its outset, the Opinion correctly recognized that the Free Speech Clause prohibits a restriction on speech that is predicated on "'its message, its ideas, its subject matter, or its content.'" *See AAPC*, 323 F. Supp. 3d at 742 (quoting *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015)). As the Opinion explained, such content-based speech restrictions "'are presumptively unconstitutional'" and are only permissible if they satisfy strict scrutiny review. *See id.* (quoting *Reed*, 135 S. Ct. at 2226). That is, the Government must establish that content-based speech restrictions have been narrowly tailored to further a compelling governmental interest.

Although the Opinion ruled that the debt-collection exemption to the automated call ban is constitutional, it initially recognized the exemption as a "content-based speech restriction." *See AAPC*, 323 F. Supp. 3d at 743. As the district court explained, the debt-collection exemption "makes content distinctions on its face." *Id.* To support that proposition, the court drew on a decision from a California court and explained that whether an automated phone call to a cell phone qualifies for the exemption "derives from the call's communicative content," and requires a court to review such content. *Id.* (citing *Gallion v. Charter Commc'ns Inc.*, 287 F. Supp. 3d 920, 927 (C.D. Cal. 2018)).

7a

In accepting the proposition that the debt-collection exemption makes content-based distinctions, the Opinion rejected—for two reasons—the Government's contention that the exemption is based only on "the relationship between a caller and a recipient," and not on the call's content. *See AAPC*, 323 F. Supp. 3d at 743. First, the Opinion observed that the "'plain language of the [debt-collection exemption] makes no reference whatsoever to the relationship of the parties.'" *Id.* (quoting *Gallion*, 287 F. Supp. 3d at 927). Second, the district court explained that the Government sought to justify the exemption on the basis of the relationship between the federal government and the debtor, i.e., the call-recipient. As the Opinion recognized, however, the debt-collection exemption is not limited to calls from the federal government to the cell phones of debtors. The exemption also provides statutory protection for "'a third party [who] has no preexisting relationship with the debtor [call-recipient].'" *Id.* (quoting *Gallion*, 287 F. Supp. 3d at 927). As such, the court was satisfied that the debt-collection exemption is predicated on the subject matter of the phone call rather than on the caller's relationship to the recipient thereof.

Notwithstanding the content-based restriction imposed by the debt-collection exemption, the Opinion ruled that it does not contravene the Free Speech Clause. The district court thus rejected the proposition advanced by the Plaintiffs that the exemption undermines the narrow tailoring of the automated call ban. In that regard, the court agreed with the Government that the exemption does not subvert the privacy interests furthered by the ban. The Opinion therefore con-

8a

cluded that the debt-collection exemption to the auto-mated call ban satisfies strict scrutiny review.[5]    That is, the exemption does not hinder the automated call ban from furthering the compelling governmental interest of protecting "the well-being, tranquility, and privacy" of American consumers in a narrowly tailored fashion. *See AAPC*, 323 F. Supp. 3d at 744.

Finally, the district court rebuffed the argument of the Plaintiffs that less restrictive alternatives would equally advance the purposes of the automated call ban. The Opinion explained that alternatives proposed by the Plaintiffs—such as time-of-day limitations, mandatory caller identity disclosure, and do-not-call lists—would not further the privacy interests underlying the TCPA and were otherwise implausible.    Because the court ruled that the debt-collection exemption to the auto-mated call ban satisfies strict scrutiny and does not con-travene the Free Speech Clause, it awarded summary judgment to the Government.

The Plaintiffs have noted a timely appeal, which has been briefed and argued.    Being satisfied that the dis-trict court had subject matter jurisdiction and rendered a final decision, we possess appellate jurisdiction pursu-ant to 28 U.S.C. § 1291.[6]

––––––––––––––––

[5]  In ruling that strict scrutiny review applies to the Plaintiffs' free speech challenge, the Opinion rejected the Government's contention that the less demanding standard of intermediate scrutiny is the pro-per level of review.

[6]  In the district court, the Government moved to dismiss the com-plaint for lack of subject matter jurisdiction, interposing two conten-tions.    First, the Government maintained that the Plaintiffs' claims were not within the jurisdiction of the district court because those claims also challenged the FCC's regulatory exemptions.    Such a

9a

## II.

We review de novo legal rulings made by a district court in connection with a summary judgment award. *See Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014). In so doing, we apply "the same legal standards as the district court," under which summary judgment is appropriate where there is no genuine dispute of material fact, "and the movant is entitled to judgment as a matter of law." *See Lawson v. Union Cty. Clerk of Court*, 828 F.3d 239, 247 (4th Cir. 2016) (citations and internal quotation marks omitted). Being confronted with a facial constitutional challenge to a statute, we review the various issues de novo. *See Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 375 (4th Cir. 2013).

## III.

### A.

#### 1.

Although the Plaintiffs agree with the district court that the debt-collection exemption to the automated call ban constitutes a content-based restriction on speech, they challenge the court's ruling that the exemption satisfies strict scrutiny review. As support, they contend that the debt-collection exemption does not further any compelling governmental interest. Moreover, they

---

challenge, according to the Government, had to be initiated in the appropriate court of appeals. *See* 28 U.S.C § 2342. Second, the Government argued that the Plaintiffs lacked Article III standing to sue. In response to the dismissal motion, the Plaintiffs explicitly abandoned any challenge to the regulatory exemptions. The district court then rejected both jurisdictional contentions and ruled that it possessed subject matter jurisdiction. On appeal, the Government does not challenge either of the jurisdictional rulings.

10a

maintain that, if a compelling governmental interest is furthered, the exemption does not do so in the least restrictive manner, as required under strict scrutiny review.   According to the Plaintiffs, the debt-collection exemption to the automated call ban imposes an impermissible content-based restriction on speech, and the entire ban—not just the debt-collection exemption—must therefore be invalidated.   In other words, the Plaintiffs maintain that severance of the exemption, if it is constitutionally flawed, is not a permissible remedy.[7]

### 2.

In order to properly assess and dispose of the Plaintiffs' Free Speech Clause challenge to the debt-collection exemption, we must address three issues.   First, we must decide whether, on one hand, the debt-collection exemption is a content-based speech restriction subject to

---

[7] In addition to their contention that the debt-collection exemption renders the automated call ban unconstitutional, the Plaintiffs seek in their appellate submissions to pursue two other arguments. First, they attempt to resurrect the proposition that the regulatory exemptions are content-based restrictions that fail strict scrutiny. In the district court, however, the Plaintiffs explicitly disclaimed any challenge to the regulatory exemptions.   We are therefore unable to consider that abandoned contention.   *See Meyer v. Berkshire Life Ins. Co.*, 372 F.3d 261, 265 n.2 (4th Cir. 2004) (explaining binding nature of judicial concessions).   Second, the Plaintiffs appear to assert that the FCC's authority to promulgate regulatory exemptions to the automated call ban supports their contention that it is unconstitutional.   The Plaintiffs, however, have not sufficiently briefed that contention.   They mention it only in passing and thus have waived it.   *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (explaining that failure to properly develop appellate contention, or merely taking a "'passing shot'" at it, waives the argument (quoting *Brown v. Nucor Corp.*, 785 F.3d 895, 923 (4th Cir. 2015))). In these circumstances, we do not further address those issues.

11a

strict scrutiny review, or whether, on the other hand, it constitutes a content-neutral speech restriction subject to intermediate scrutiny analysis. *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). Second, we must evaluate whether the debt-collection exemption to the automated call ban survives the applicable level of scrutiny. *See id.* at 2231. Finally, if the debt-collection exemption impermissibly infringes on free speech rights, we must identify the appropriate remedy for that infringement. That is, we must then decide whether to strike the automated call ban in its entirety, or whether to simply sever the flawed exemption therefrom. *See Regan v. Time, Inc.*, 468 U.S. 641, 652-53 (1984).

### B.

### 1.

### a.

In the First Amendment context, a statutory provision constitutes a content-based speech restriction if it "applies to particular speech because of the topic discussed or the idea or message expressed." *See Reed*, 135 S. Ct. at 2227. Such a speech restriction is presumptively unconstitutional and can only be justified if it is narrowly tailored to further a compelling governmental interest. *See id.* To determine whether a statutory provision imposes a content-based speech restriction, the Supreme Court has identified a two-prong inquiry. As the Court explained in its *Reed* decision in 2015, the inquiry's first prong requires a reviewing court to decide whether the statute is content-based on its face —that is, whether the text thereof distinguishes between speech based on content or subject matter. *See id.* at 2228. If the statute is determined to be facially

12a

content-based, the court must conduct a strict scrutiny review.   If the statute is facially content-neutral, however, it must satisfy the second prong of the *Reed* inquiry in order to be reviewed under intermediate scrutiny—a less demanding level of scrutiny that generally applies to content-neutral restrictions.   Under *Reed*'s second prong, a statute constitutes a content-based restriction on speech if it "cannot be justified without reference to the content of the regulated speech," or if it was adopted because the government disagrees with the message conveyed thereby.   *Id.* at 2227 (internal quotation marks omitted) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

### b.

Analyzed under *Reed*'s first prong, the debt-collection exemption to the automated call ban facially distinguishes between phone calls on the basis of their content.   As that exemption specifies, otherwise prohibited automated calls made to cell phones "solely to collect a debt owed to or guaranteed by the United States" do not violate the automated call ban and are legally permissible.   *See* 47 U.S.C. § 227(b)(1)(A)(iii).   But automated calls made to cell phones that deal with other subjects—such as efforts to collect a debt neither owed to nor guaranteed by the United States—do not qualify for the debt-collection exemption and are prohibited by the automated call ban.   A proper application of the debt-collection exemption therefore "depend[s] entirely on the communicative content of the [call]" and, as the district court ruled, constitutes a content-based speech restriction that is subject to strict scrutiny.   *See Reed*, 135 S. Ct. at 2227.

13a

The content-based nature of the debt-collection exemption is demonstrated by an illustrative example. As explained by the district court, a private debt collector could make two nearly identical automated calls to the same cell phone using prohibited technology, with the sole distinction being that the first call relates to a loan guaranteed by the federal government, while the second call concerns a commercial loan with no government guarantee.   Although the first automated call would satisfy the debt-collection exemption and not be subject to the automated call ban, the second call would not satisfy the exemption and would be illegal.   The legality of those phone calls, due solely to the debt-collection exemption, thus depends on their subject matter (i.e., their content).

c.

Seeking to avoid a judicial determination that the debt-collection exemption is a content-based speech restriction, the Government maintains on appeal that the exemption "is premised principally on the relationship between the [federal] government and the person being called."   *See* Br. of Appellees 6.   That relationship, according to the Government, emanates from a loan or guarantee arrangement between the federal government and the debtor.   Because the debt-collection exemption applies to automated phone calls that have a nexus with a government-debtor arrangement—and the relationship it creates—the applicability of the exemption turns on the debtor's relationship with the federal government.   The Government therefore contends that whether an automated phone call is authorized by the debt-collection exemption, and thus not prohibited by

14a

the automated call ban, depends on the relationship of the parties thereto, and not on the content thereof.[8]

Like the district court, however, we are persuaded that the statutory text of the debt-collection exemption undercuts the Government's relationship-based contention. The text of the exemption makes no reference to the relationship between the caller and the recipient of the automated phone call. To be sure, a relationship is created when a debtor owes a debt that is guaranteed by the federal government. But the restriction imposed by the debt-collection exemption—and the carveout it creates—does not regulate on the basis of that relationship. Instead, the exemption regulates on the basis of the content of the phone call. Under the debt-collection exemption, the relationship between the federal government and the debtor is only relevant to the subject matter of the call. In other words, the debt-collection exemption applies to a phone call made to the debtor because the call is about the debt, not because of any relationship between the federal government and the debtor. And the Supreme Court has recognized that "regulation of speech is content based if a law applies to particular speech because of the topic discussed." *See Reed*, 135 S. Ct. at 2227. In these circumstances, the

---

[8] As part of its relationship-based argument, the Government emphasizes that the TCPA does not apply to automated calls made by the federal government. *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016) ("The United States and its agencies, it is undisputed, are not subject to the TCPA's prohibitions."). It contends that the debt-collection exemption merely permits persons making calls on behalf of the federal government to "use the same means" that the United States or its agencies could use. *See* Br. of Appellees 6-7. We are not persuaded by that proposition.

15a

debt-collection exemption to the automated call ban constitutes a content-based speech restriction.

2.

a.

Because the debt-collection exemption is a content-based restriction on speech, it can only pass constitutional muster if it satisfies a strict scrutiny review. *See Reed*, 135 S. Ct. at 2231.   Strict scrutiny is a rigorous standard of review that requires the speech restriction to advance a sufficiently important governmental objective—that is, an objective of the "highest order."   *See id.* at 2232; *see also McCutcheon v. FEC*, 572 U.S. 185, 199 (2014).   Any content-based restriction must also be narrowly tailored, that is, "closely drawn," in order to fit that objective.   *See McCutcheon*, 572 U.S. at 199.   Thus, in order to survive strict scrutiny, the Government must show that the debt-collection exemption has been narrowly tailored to further a compelling governmental interest.   *See Reed*, 135 S. Ct. at 2231.

In conducting a strict scrutiny review, we are obliged to examine the speech restriction for an infirmity that is commonly referred to as "underinclusiveness."   *See Reed*, 135 S. Ct. at 2232.   An "underinclusive" restriction is one that covers too little speech, thereby leaving "appreciable damage to the government's interest unprohibited."   *See Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015) (citations and internal quotation

16a

marks omitted).   An underinclusive restriction thus
fails a strict scrutiny review.   *See id.* at 405-06.[9]

Put succinctly, the debt-collection exemption fails
strict scrutiny review.   It is fatally underinclusive for
two related reasons.   First, by authorizing many of the
intrusive calls that the automated call ban was enacted
to prohibit, the debt-collection exemption subverts the
privacy protections underlying the ban.   Second, the
impact of the exemption deviates from the purpose of
the automated call ban and, as such, it is an outlier among
the other statutory exemptions.

b.

In seeking to justify the debt-collection exemption,
the Government maintains that the automated call ban
(including that exemption) furthers a compelling gov-
ernmental interest by protecting personal and residen-
tial privacy.   Relying on congressional findings sup-
porting the TCPA, the Government argues that auto-
mated calls are "the most intrusive" type of phone calls.
*See* Br. of Appellees 20.   By "generally preventing" the
use of such calls to cell phones, the Government con-
tends that the automated call ban protects and shelters
the privacy interests of American consumers.   *See id.*
It also argues that, as part of the automated call ban, the

---

[9]  Although an "underinclusive" content-based restriction applies
to too little speech, an impermissibly "overinclusive" restriction reg-
ulates too much speech and unnecessarily circumscribes protected ex-
pression.   *See Cahaly*, 796 F.3d at 405.   Because the debt-collection
exemption to the automated call ban is fatally "underinclusive,"
we need not assess any issue of "overinclusiveness."   *See Reed*,
135 S. Ct. at 2231-32 (examining only underinclusiveness of speech
restriction).

17a

debt-collection exemption does not undermine the privacy protection efforts embodied in the ban. According to the Government, that exemption applies only to a "narrow category of calls." *See id.* at 18. It therefore asserts that the debt-collection exemption does not "appreciabl[y] damage" the privacy interests underlying the automated call ban. *See id.*

We are unpersuaded by the Government's compelling interest argument. Again, the debt-collection exemption does not further the purpose of the automated call ban in a narrowly tailored fashion. Congress implemented the ban in order to protect privacy interests. *See* S. Rep. No. 102-178, at 1, 5 (1991) (explaining that purpose of TCPA is to protect "privacy interests"); *see also Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012) (discussing congressional findings supporting TCPA prohibitions). The debt-collection exemption, however, undercuts those privacy protections. In fact, the exemption applies in a manner that runs counter to the privacy interests that Congress sought to safeguard.

Significantly, the potential reach of the debt-collection exemption belies the Government's asserted "narrow" framing of it. According to the FCC, the federal government, by the end of fiscal year 2016, had either guaranteed or was owed nearly eighty-percent of all outstanding student loan debt. *See In re Rules & Regulations Implementing the TCPA*, 31 FCC Rcd. 9074, 9077 n.28 (Aug. 11, 2016). An FCC report also revealed that more than 41 million borrowers owed over one trillion dollars in federal student loans. *See id.* Notably, student loan debt, which is generally handled through the Department of Education, is but one category of debt

18a

that is guaranteed by or owed to the federal government.  *See id.* at 9077-78.   Various other categories of such debt are handled through other departments, which include the Department of Agriculture, the Department of Housing and Urban Development, and the Department of Health and Human Services.  *See id.*  Thus, millions of debtors owe debts about which third parties can make otherwise prohibited calls under the debt-collection exemption.   The exemption is not at all "narrow" when it is assessed in that context.

Because of the expansive reach of the debt-collection exemption, it is woefully underinclusive and does not serve the compelling governmental interest of protecting privacy in a narrow fashion.   The exemption thus cannot be said to advance the purpose of privacy protection, in that it actually authorizes a broad swath of intrusive calls.   In so doing, the debt-collection exemption exposes millions of American consumers to some of the most disruptive phone calls they receive.   The exemption therefore erodes the privacy protections that the automated call ban was intended to further.  *See Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1668 (2015) (recognizing that speech restrictions with vast carveouts can undermine compelling governmental interest).   Although theoretically limited by the number of debtors owing loans guaranteed by the federal government, the debt-collection exemption authorizes a nearly "unlimited proliferation" of disruptive and intrusive automated debt-collection efforts.   *See Reed*, 135 S. Ct. at 2231.[10]

---

[10] In addition to contending that the automated call ban—including the debt-collection exemption—advances an interest in protecting

19a

c.

Likewise, a comparative analysis of the auto-
mated phone calls authorized under the debt-collection
exemption with those permissible under the other
statutory exemptions shows the detrimental effect of
debt-collection calls on the privacy interests that under-
lie the automated call ban.   For example, phone calls au-
thorized under the consent exemption require "the prior
express consent of the called party."   *See* 47 U.S.C.
§ 227(b)(1)(A).   Because consent generally diminishes
any expectation of privacy, phone calls that qualify for
the consent exemption are less intrusive than other au-
tomated calls.   *See Norris v. Premier Integrity Sols.,
Inc.*, 641 F.3d 695, 699 (6th Cir. 2011) (explaining that
consent diminishes expectation of privacy in constitu-
tional context).   On the other hand, the FCC itself has
acknowledged that debt-collection calls are among the
most intrusive, disruptive, and complained of phone

_____

privacy, the Government interposes another justification for the
debt-collection exemption.   It maintains that the exemption pro-
tects the public fisc by aiding in the collection of debts owed to the
federal government, plus other debts for which the government is
possibly on the hook.   Assuming the debt-collection exemption fur-
thers such an interest, however, it is not narrowly tailored to that
end and must be rejected.   That is, the federal government has less
restrictive alternatives at its disposal to collect such debts.   *See
United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000)
(explaining that First Amendment requires the use of less restric-
tive alternatives to content-based speech restrictions).   And such
alternatives could be used without running afoul of the automated
call ban.   First, the federal government could secure consent from the
debtors to make debt-collection calls.   *See* 47 U.S.C. § 227(b)(1)(A).
Second, it could place the calls itself, in that the federal government
is not subject to the automated call ban.

20a

calls made to American consumers.[11]   In fact, the FCC receives more complaints about debt-collection phone calls than calls "relating to  . . .  any other industry." *See In re Rules & Regulations Implementing the TCPA*, 31 FCC Rcd. at 9077 (explaining that, in 2015, FCC received over 900,000 complaints about debt-collection calls).

The automated phone calls authorized under the emergency exemption also contrast sharply with debt-collection calls.   In order to qualify for the emergency exemption, phone calls must be "necessary in any situation affecting the health and safety" of Americans.   *See* 47 C.F.R. § 64.1200(f)(4).   Emergency automated phone calls therefore differ from debt-collection calls in three important ways.   First, emergency calls serve the vital purpose of protecting the safety and welfare of Americans, and the debt-collection calls lack any similarly important purpose.   *See ACA Int'l v. FCC*, 885 F.3d 687, 714 (D.C. Cir. 2018) (contrasting debt-collection calls with emergency calls).   Second, automated phone calls made under the emergency exemption are much less likely to negatively impact Americans' sense of privacy. *See In re TCPA*, 7 FCC Rcd. 2736, 2738 (Apr. 17, 1992) (explaining that emergency calls are only made when "it is in the public interest to convey information to consumers concerning health or safety").   Third, such emergency calls are generally made less often because they "must be about a *bona fide* emergency that is relevant

---

[11] Beyond its acknowledgement of the disruption caused by debt-collection calls, the FCC recognizes that the proliferation of automated phone calls under the debt-collection exemption could "magnify consumer harms arising from debt collection calls."   *See In re Rules & Regulations Implementing the TCPA*, 31 FCC Rcd. at 9077.   For example, such phone calls render American consumers more susceptible to telephone scams.   *See id.*

21a

to the called party." *See In re Rules & Regulations Implementing the TCPA*, 31 FCC Rcd. 9054, 9063 n.76 (Aug. 4, 2016) (emphasizing that emergency exemption "will not promote the proliferation of unwanted" calls).

Unlike the consent and emergency exemptions, the debt-collection exemption impedes the privacy interests of the automated call ban. The debt-collection exemption is thus an outlier among the statutory exemptions. The divergence between the debt-collection exemption and the other two exemptions shows that the debt-collection exemption is incompatible with the privacy interests justifying the ban.

d.

As the Supreme Court emphasized in its *Reed* decision, a "'law cannot be regarded as protecting an interest of the highest order, and therefore as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited.'" *See* 135 S. Ct. at 2232 (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002)). The content-based loophole created by the debt-collection exemption does what the *Reed* Court condemned. *See Williams-Yulee*, 135 S. Ct. at 1668 (explaining that underinclusive restrictions "can raise 'doubts about whether the government is in fact pursuing the interest it invokes'" (quoting *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 802 (2011)); *White*, 536 U.S. at 780 (recognizing that a restriction on speech might permit so much of the objectionable speech as to "render belief in that purpose a challenge to the credulous"). In these circumstances, the debt-collection exemption fails to satisfy strict scru-

22a

tiny, constitutes an unconstitutional content-based re-
striction on speech, and therefore violates the Free
Speech Clause.

3.

a.

In that the debt-collection exemption contravenes
the Free Speech Clause, we must also consider and iden-
tify the impact of that ruling on the balance of the auto-
mated call ban.   Because the district court ruled that
the exemption satisfies strict scrutiny, it had no reason
to address the question of severance.    Anticipating that
we might rule in favor of the Plaintiffs, however, the par-
ties have addressed the severance issue on appeal.[12]
The Plaintiffs maintain in their appellate submissions
that the constitutionally flawed debt-collection exemp-
tion invalidates the entirety of the automated call ban,
rendering severance of the debt-collection exemption
improper.    The Government argues, however, that the
controlling authorities require a severance of the ex-
emption from the automated call ban.

For several reasons, we agree with the Government
on the severance issue.    First and foremost, the explicit
directives of the Supreme Court and Congress strongly
support a severance of the debt-collection exemption from
the automated call ban.    Furthermore, the ban can oper-

---

[12]  Although we could remand the severance issue for resolution by
the district court in the first instance, we will not do so.   In these
circumstances, the issue is straightforward, and we prefer to resolve
it now.   *See Costco Wholesale Corp. v. Maleng*, 522 F.3d 874, 886
(9th Cir. 2008) (deciding severance issue on appeal because, inter
alia, merits and severance were "intimately tied").

23a

ate effectively in the absence of the debt-collection exemption, which is clearly an outlier among the statutory exemptions.

### b.

In circumstances such as these, the Supreme Court has recognized that severance is the preferred remedy. As the Chief Justice explained in the Court's *NFIB v. Sebelius* decision, if Congress wants the balance of a statute to stand when one aspect is constitutionally flawed, a reviewing court "must leave the rest of the [statute] intact." *See* 567 U.S. 519, 587 (2012). By severing the flawed portion of a statute, the court can limit the impact of its ruling of constitutional infirmity. *See Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328 (2006); *United States v. Under Seal*, 819 F.3d 715, 721-22 (4th Cir. 2016) (recognizing that severance of a flawed portion of a statute prevents a court from nullifying too much of that enactment). The general rule is thus "'that partial . . . invalidation [of a statute] is the required course.'" *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010) (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)).

Complementing the Supreme Court's strong preference for a severance in these circumstances, Congress has explicitly mandated that, if a TCPA provision is determined to be constitutionally infirm, severance is the appropriate remedy. That is, Congress has directed that, if any part of the TCPA "is held invalid, the remainder . . . shall not be affected." *See* 47 U.S.C. § 608. That severability provision eases our inquiry on the severance issue and creates "a presumption that Congress did not intend the validity of the statute in question to

24a

depend on the validity of the constitutionally offensive provision." *See Alaska Airlines*, 480 U.S. at 686 (citing *INS v. Chadha*, 462 U.S. 919, 932 (1983)).   As a result, severance of the debt-collection exemption from the balance of the automated call ban will comply with the explicit directive of Congress and with controlling Supreme Court precedent.

We are also satisfied that a severance of the debt-collection exemption will not undermine the automated call ban.   For twenty-four years, from 1991 until 2015, the automated call ban was "fully operative."   *Free Enter. Fund*, 561 U.S. at 509 (citations and internal quotation marks omitted).   As a result, the Plaintiffs simply cannot show that excising the debt-collection exemption will hamper the function of the ban.   *See Alaska Airlines*, 480 U.S. at 686 (explaining that only "strong evidence" overcomes presumption created by severability clause).   In these circumstances, we agree with the Government and direct the severance of the debt-collection exemption from the balance of the automated call ban.

## IV.

Pursuant to the foregoing, we vacate the district court's award of summary judgment to the Government.   We also direct the severance of the debt-collection exemption from the balance of the automated call ban and remand for such further proceedings as may be appropriate.

*VACATED AND REMANDED*

25a

**APPENDIX B**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

————

No. 5:16-CV-252-D

AMERICAN ASSOCIATION OF POLITICAL CONSULTANTS,
DEMOCRATIC PARTY OF OREGON, INC., PUBLIC POLICY
POLLING, LLC, TEA PARTY FORWARD PAC,
AND WASHINGTON STATE DEMOCRATIC CENTRAL
COMMITTEE, PLAINTIFFS

*v.*

JEFFERSON SESSIONS, ATTORNEY GENERAL OF THE
UNITED STATES, AND FEDERAL COMMUNICATIONS
COMMISSION, DEFENDANTS

————

Mar. 24, 2018

————

**ORDER**

————

On May 12, 2016, the American Association of Political Consultants, Inc., the Democratic Party of Oregon, Inc., Public Policy Polling, LLC, the Tea Party Forward PAC, and the Washington State Democratic Central Committee (collectively, "plaintiffs") sued United States Attorney General Loretta Lynch in her official capacity and the Federal Communications Commission ("the

26a

FCC") (collectively, "defendants") [D.E. 1].[1]   On Au-
gust 5, 2016, plaintiffs amended their complaint [D.E.
18].   Plaintiffs contend that the autodialing ban in
47 U.S.C. § 227(b)(1)(A)(iii) of the Telephone Consumer
Protection Act of 1991, as amended ("TCPA") violates
the First Amendment.   See Am. Compl. [D.E. 18] ¶¶ 2,
36-63.   On September 2, 2016, defendants moved to dis-
miss plaintiffs' amended complaint for lack of subject-
matter jurisdiction [D.E. 22] and filed a memorandum in
support [D.E. 23].   See Fed. R. Civ. P. 12(b)(1).   On
March 15, 2017, the court denied defendants' motion to
dismiss [D.E. 26].

On May 19, 2017, plaintiffs moved for summary judg-
ment [D.E. 30] and filed a memorandum in support
[D.E. 31 ].   On June 19, 2017, defendants responded in
opposition [D.E. 33], cross-moved for summary judg-
ment [D.E. 34], and filed a memorandum in support
[D.E. 35].   On July 5, 2017, plaintiffs responded and re-
plied [D.E. 36].   On July 20, 2017, defendants replied
[D.E. 39].   As explained below, this court joins the five
other United States District Courts that have addressed
the issue and holds that 47 U.S.C. § 227(b)(1)(A)(iii) does
not violate the First Amendment.   See Gallion v. Char-
ter Commc'ns Inc., No. 5:17-cv-01361-CAS(KKx), 2018
WL 1135386, at*4-7 (C.D. Cal. Feb. 26, 2018) (unpub-
lished), appeal docketed, No. 18-80031 (9th Cir. Mar. 8,
2018); Greenley v. Laborers' Int'l Union of N. Am.,
271 F. Supp. 3d 1128, 1145-51 (D. Minn. 2017); Mejia v.

---

[1]  On February 19, 2017, Jefferson Sessions became Attorney Gen-
eral of the United States.   A public officer's "successor is automat-
ically substituted as a party."   Fed. R. Civ. P. 25(d).   On July 11,
2017, Tea Party Forward withdrew from this lawsuit.   See [D.E. 37,
38].

27a

Time Warner Cable Inc., 15-CV-6445 (JPO), 15-CV-6518 (JPO), 2017 WL 3278926, at *12-17 (S.D.N.Y. Aug. 1, 2017) (unpublished); Holt v. Facebook, Inc., 240 F. Supp. 3d 1021, 1032-34 (N.D. Cal. 2017), appeal docketed No. 17-80086 (9th Cir. May 12, 2017); Brickman v. Facebook, Inc., 230 F. Supp. 3d 1036, 1043-49 (N.D. Cal. 2017). Thus, the court grants defendants' motion for summary judgment.

## I.

After holding numerous hearings and compiling extensive evidence, Congress enacted the TCPA to protect the privacy interests of residential telephone subscribers.   See Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243 § 2(10) (1991).   Congress found that "[t]echnologies that might allow consumers to avoid receiving [robocalls] are not universally available, are costly, are unlikely to be enforced, or place an inordinate burden on the consumer."   Id. § 2(11).   In enacting the TCPA, Congress recognized that every call, whether to a phone at home or in a person's pocket, "uses some of the phone owner's time and mental energy, both of which are precious."   Patriotic Veterans, Inc. v. Zoeller, 845 F.3d 303, 305-06 (7th Cir. 2017); see Moser v. FCC, 46 F.3d 970, 972 (9th Cir. 1995); Mey v. Venture Data, LLC, 245 F. Supp. 3d 771, 777-80 (N.D. W. Va 2017).

The TCPA makes it unlawful

to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—to any telephone number assigned to a paging

service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States[.]

47 U.S.C. § 227(b)(1)(A)(iii); see Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243 § 2(12) (1991). In 2015, Congress added the final clause of the TCPA, which exempts calls made solely to collect a debt owed to or guaranteed by the United States.   See Woods v. Santander Consumer USA Inc., No. 2:14-cv-02104-MHH, 2017 WL 1178003, at *3 (N.D. Ala. Mar. 30, 2017) (unpublished); Bipartisan Budget Act of 2015, Pub. L. No. 114-74 § 301, 129 Stat. 584, 588 (2015).

The TCPA authorizes the FCC to implement regulations that may exempt some calls from this subsection.

The [FCC] shall prescribe regulations to implement the requirements of this subsection.   In implementing the requirements of this subsection, the [FCC]—

(A)   shall consider prescribing regulations to allow businesses to avoid receiving calls made using an artificial or prerecorded voice to which they have not given their prior express consent;

(B)   may, by rule or order, exempt from the requirements of paragraph (1)(B) of this subsection, subject to such conditions as the Commission may prescribe—

(i)   calls that are not made for a commercial purpose; and

29a

    (ii)   such classes or categories of calls made for commercial purposes as the Commission determines—

        (I)   will not adversely affect the privacy rights that this section is intended to protect; and

        (II)  do not include the transmission of any unsolicited advertisement;

(C)  may, by rule or order, exempt from the requirements of paragraph (1)(A)(iii) of this subsection calls to a telephone number assigned to a cellular telephone service that are not charged to the called party, subject to such conditions as the Commission may prescribe as necessary in the interest of the privacy rights this section is intended to protect[.]

47 U.S.C. § 227(b)(2); see Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243 § 2(13) (1991) ("While the evidence presented to the Congress indicates that automated or prerecorded calls are a nuisance and an invasion of privacy, regardless of the type of call, the Federal Communications Commission should have the flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or invasion of privacy, or for noncommercial calls, consistent with the free speech protections embodied in the First Amendment of the Constitution.").

    Plaintiffs are political organizations or polling organizations and want to be able to use an autodialer and prerecorded messages to convey and receive information. Using an autodialer and prerecorded messages costs a lot less than hiring and paying human beings to call a

30a

telephone number and (1) either obtain express consent of the called party for a prerecorded message or (2) convey or receive information.

In support of their argument that the TCPA's autodialing ban violates the First Amendment, plaintiffs cite statutory exceptions from the ban in the TCPA and exemptions from the ban in FCC orders. See Am. Compl. ¶¶ 22, 28-35. The statutory exceptions include calls made with the express consent of the called party, calls made for emergency purposes, or calls made to collect a debt owed to or guaranteed by the United States. See 47 U.S.C. § 227(b)(1)(A), (b)(1)(A)(iii). The FCC's regulatory exemptions include uncharged calls from a wireless carrier to its customer, uncharged package delivery notifications, non-telemarketing communications where a third party has represented to the sender that the recipient has consented to the communications, emergency calls related to healthcare, certain calls related to identity theft, and calls from federal government officials conducting official business. See Telephone Consumer Protection Act of 1991, 77 Fed. Reg. 34233, 34235 (June 11, 2012) (exempting wireless carriers); In the Matter of Cargo Airline Ass'n Petition for Expedited Declaratory Ruling, 29 FCC Rcd. 3432, 3439 (Mar. 27, 2014) (exempting package-delivery notifications); In the Matter of GroupMe. Inc./Skype Commc'ns S.A.R.L., 29 FCC Rcd. 3442, 3444 (Mar. 27, 2014) (exempting third-party representation of consent); In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 30 FCC Rcd. 7961, 8023-24, 8031 (July 10, 2015) (exempting certain calls related to healthcare and identity theft); In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, CG Docket No. 02-278

31a

¶ 12 (July 5, 2016) (exempting calls made by federal officials conducting official business).

Plaintiffs argue that 47 U.S.C. § 227(b)(1)(A)(iii) is an unconstitutional content-based restriction on speech because the government-debt exception and the FCC regulatory exemptions favor commercial speech over core political speech.   See [D.E. 31] 5-6.   Defendants respond that 47 U.S.C. § 227(b)(1)(A)(iii) is a valid, content-neutral law.   See [D.E. 35] 6-13.   Alternatively, defendants argue that 47 U.S.C. § 227(b)(1)(A)(iii) satisfies strict scrutiny.   See id. at 20-28.

## II.

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a). The party seeking summary judgment must initially show an absence of a genuine dispute of material fact or the absence of evidence to support the nonmoving party's case.   Celotex Com. v. Catrett, 477 U.S. 317, 325 (1986).   If a moving party meets its burden, the nonmoving party must "come forward with specific facts showing that there is a genuine issue for trial."   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quotation and emphasis omitted).   A genuine issue for trial exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).   "The mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient.  .  .  . "   Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmov-

32a

ing party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that might affect the outcome under substantive law preclude summary judgment. <u>Anderson</u>, 477 U.S. at 248. In reviewing the factual record, the court views the facts in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor. <u>Matsushita</u>, 475 U.S. at 587-88. "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." <u>Desmond v. PNGI Charles Town Gaming, L.L.C.</u>, 630 F.3d 351, 354 (4th Cir. 2011).

## III.

The First Amendment "prohibits the enactment of laws abridging the freedom of speech[,]" and deprives the government of the "power to restrict expression because of its message, its ideas, its subject matter, or its content." <u>Reed v. Town of Gilbert</u>, 135 S. Ct. 2218, 2226 (2015); <u>see</u> U.S. Const. amend. I. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." <u>Reed</u>, 135 S. Ct. at 2226; <u>see</u> <u>R.A.V. v. St. Paul</u>, 505 U.S. 377, 395 (1992). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. . . . This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys."

33a

Reed, 135 S. Ct. at 2227 (citations omitted). Regulations or restrictions on speech which "depend entirely on the communicative content of the [speech]" are content-based regulations and are therefore subject to strict scrutiny.  Id.  If a restriction is facially content-based, courts apply strict scrutiny, "regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech."  Id. at 2228 (quotation omitted). "[I]llicit legislative intent is not the *sine qua non* of a violation of the First Amendment."  Id. (quotation omitted).  "[T]he crucial first step in the content-neutrality analysis is to determine whether the law is content neutral on its face."  Cahaly v. Larosa, 796 F.3d 399, 405 (4th Cir. 2015) (quotation and alteration omitted); see Reed, 135 S. Ct. at 2228.

The TCPA's government-debt exception is a content-based speech restriction "because it makes content distinctions on its face."  Cahaly, 796 F.3d at 405.  In order for a court to determine whether a potential defendant violated the TCPA's government-debt exception, the court must review the communicative content of the call.  If the call was made "solely to collect a debt owed to or guaranteed by the United States," the defendant would not be liable under the TCPA.  See 47 U.S.C. § 227(b)(1)(A)(iii).  If the call concerned any other topic, the defendant would be liable.  See id.  For example, under the TCPA, "a private debt collection agency may call the same consumer twice in a row, once to collect a private, government-guaranteed loan and once to collect a similar private loan not guaranteed by the government, but, absent prior express consent, may place only the first call using an autodialer or prere-

34a

corded voice." Gallion, 2018 WL 1135386, at *4 (quotation omitted). This distinction derives from the call's communicative content. See id. at *5; Greenley, 271 F. Supp. 3d at 1146-49; Mejia, 2017 WL 3278926, at *14-15; Holt, 240 F. Supp. 3d at 1032-33; Brickman, 230 F. Supp. 3d at 1043-45; cf. Gomez v. Campbell-Ewald Co., 768 F.3d 871, 876-77 (9th Cir. 2014) (holding that the pre-2015 version of TCPA without the government-debt exception is content-neutral), aff'd on other grounds, 136 S. Ct. 663 (2016); Woods, 2017 WL 1178003, at *3-5 (same). In opposition to this conclusion, defendants argue that the government-debt exception is not content-based, but instead based on the relationship between the parties to the call. A restriction based on the relationship between a caller and a recipient is not content-based if the restriction applies independently of "what the caller proposes to say." Patriotic Veterans Inc., 845 F.3d at 304-05; see Van Bergen v. Minn., 59 F.3d 1541, 1550 (8th Cir. 1995).

This court rejects defendants' argument. First, "the plain language of the [government-debt] exception makes no reference whatsoever to the relationship of the parties." Gallion, 2018 WL 1135386, at *5 (quotation and alteration omitted); see Brickman, 230 F. Supp. 3d at 1045; cf. Patriotic Veterans, 845 F.3d at 305; Van Bergen, 59 F.3d at 1550. Second, the relationship at issue for the government-debt exception is the relationship between the government and the debtor, but the exception allows "a third party that has no preexisting relationship with the debtor" to use an autodialer or recorded voice to call to collect a debt owed to or guaranteed by the United States. Gallion, 2018 WL 1135386, at *5 (quotation omitted). Thus, the government debt-

35a

exception is "based on the subject matter of the call regardless of the caller's relationship to the recipient." Greenley, 271 F. Supp. 3d at 1148; see Gallion, 2018 WL 1135386, at *5.

Content-based speech restrictions are subject to strict scrutiny. See Cahaly, 796 F.3d at 405. Strict scrutiny does not mean "strict in theory, but fatal in fact." Williams-Yulee v. Fla. Bar, 135 S. Ct. 1656, 1666 (2015) (quotation omitted). "To survive strict scrutiny, the government must prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." Greenley, 271 F. Supp. 3d at 1149 (quotation and alteration omitted); see Reed, 135 S. Ct. at 2231; Cahaly, 796 F.3d at 405. The government also must use "the least restrictive means" among equally effective alternatives to accomplish its compelling state interest. See Ashcroft v. ACLU, 542 U.S. 656, 666 (2004).

As for whether the autodialing ban furthers a compelling state interest, the Supreme Court has reviewed and upheld Congress's extensive findings that "automated or prerecorded telephone calls made to private residences . . . were rightly regarded by recipients as an invasion of privacy." Mims v. Arrow Fin. Servs., LLC, 565 U.S. 368, 372 (2012) (quotation and alteration omitted); see Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243 § 2(10) (1991). The Supreme Court also has held that "[t]he State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." Carey v. Brown, 447 U.S. 455, 471 (1980); see Gallion, 2018 WL 1135386, at *5. "One important aspect of residential privacy is protection of the

36a

unwilling listener. . . . [I]ndividuals are not required to welcome unwanted speech into their own homes and . . . the government may protect this freedom." <u>Frisby v. Schultz</u>, 487 U.S. 474, 484-85 (1988); <u>see</u> <u>Gallion</u>, 2018 WL 1135386, at *5; <u>cf.</u> <u>Cahaly</u>, 796 F.3d at 405 (assuming that "protect[ing] residential privacy and tranquility from unwanted and intrusive robocalls" is a compelling state interest).   Thus, the court concludes that protecting the well-being, tranquility, and privacy of the individual's residence is a compelling state interest and that the TCPA auto-dialing ban furthers that compelling interest.   <u>See</u>, <u>e.g.</u>, <u>Patriotic Veterans</u>, 845 F.3d at 305-06; <u>Van Bergen</u>, 59 F.3d at 1554; <u>Gallion</u>, 2018 WL 1135386, at *5-6; <u>Greenley</u>, 271 F. Supp. 3d at 1150; <u>Mejia</u>, 2017 WL 3278926, at *16; <u>Woods</u>, 2017 WL 1178003, at *5; <u>Holt</u>, 240 F. Supp. 3d at 1033; <u>Brickman</u>, 230 F. Supp. 3d at 1046.

Content-based speech restrictions that serve compelling state interests must be narrowly tailored to meet those interests.   <u>See</u> <u>Reed</u>, 135 S. Ct. at 2231; <u>Cahaly</u>, 796 F.3d at 405.   Narrow tailoring requires that the restriction not be underinclusive or overinclusive in the speech that it restricts, and the government must use the least restrictive means to serve its interests.   <u>See</u> <u>Cahaly</u>, 796 F.3d at 405-06.   However, narrow tailoring does not require perfect tailoring.   <u>Williams-Yulee</u>, 135 S. Ct. at 1671.

As for underinclusiveness, the "First Amendment imposes no freestanding 'underinclusiveness limitation,'" although underinclusivity raises a red flag about whether the regulation is truly targeted to further a compelling state interest.   <u>Id.</u> at 1668.   "It is always somewhat counterintuitive to argue that a law violates

37a

the First Amendment by abridging *too little* speech." Id. (emphasis in original). The underinclusiveness inquiry weighs "doubts as to whether the government is pursuing an interest it invokes or whether the statute furthers a compelling interest." Brickman, 230 F. Supp. 3d at 1046. A statute or regulation which admits too many exceptions fails to further a compelling interest. After all, "a law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." Reed, 135 S. Ct. at 2232 (quotation omitted); see Republican Party of Minn. v. White, 536 U.S. 765, 780 (2002).

Plaintiffs make two underinclusiveness arguments. First, they argue that the government-debt exception is underinclusive in the same way that the sign ordinance invalidated in Reed was underinclusive and unconstitutionally favors speakers seeking to collect government debts. See [D.E. 31] 6. Second, they argue that Congressional delegation of exemption-making authority to the FCC provides the possibility for the proliferation of exemptions. See id. at 17-18.

As for the TCPA's government-debt exception, it stands in stark contrast to the sign ordinance that the Supreme Court invalidated in Reed. See Reed, 135 S. Ct. at 2224-28, 2231-32. The sign ordinance in Reed exempted 23 categories of signs and allowed the unlimited proliferation of various other signs. See id. Unlike the exception-riddled sign ordinance in Reed, the TCPA's government-debt exception is a narrow exception that furthers a compelling interest. See Gallion, 2018 WL 1135386, at *7; Mejia, 2017 WL 3278926, at *16 ("[T]he federal government's interest in collecting debts

38a

owed to it supports the finding of a particularly compel-
ling interest in exempting calls made for the purposes
of collecting government debts."). Moreover, "the
TCPA's express grant of authority to the FCC to re-
strict or limit the number and duration of calls made to
collect a debt owed to or guaranteed by the United
States" further limits the TCPA's government-debt ex-
ception. Gallion, 2018 WL 1135386, at *7 (quotation
and alteration omitted). Additionally, the FCC has is-
sued a proposed rule limiting the number of federal debt
collection calls to three within a 30-day period and lim-
iting call lengths to 60 seconds or less. Id. The court
concludes "that the narrow, FCC-regulated government-
debt exception does not do appreciable damage to the pri-
vacy interests underlying the TCPA." Id. (quotation
omitted); see Mejia, 2017 WL 3278926, at *17; Holt,
240 F. Supp. 3d at 1033; Brickman, 230 F. Supp. 3d at 1047.

As for plaintiffs' complaints about the FCC orders
adding certain other narrow exemptions to the autodial-
ing ban that the FCC issued pursuant to its delegated
authority, this court lacks jurisdiction to adjudicate the
validity of such orders. See Order [D.E. 26] 3; Mejia,
2017 WL 3278926, at *15 n.7. Any party wishing to chal-
lenge the substance of any order that the FCC issued
under 47 U.S.C. § 227(b)(2) must file an action in
"[t]he court of appeals (other than the United States
Court of Appeals for the Federal Circuit) [which] has ex-
clusive jurisdiction to enjoin, set aside, suspend (in whole
or in part), or to determine the validity of all final orders
of the Federal Communications Commission. . . . "
28 U.S.C. § 2342. Because this court lacks jurisdiction
to entertain a constitutional challenge concerning
such FCC orders, the court "does not consider those

39a

exceptions for purpose of this analysis." <u>Greenley</u>, 271 F. Supp. 3d at 1149.

As for Congressional delegation to the FCC in 47 U.S.C. § 227(b)(2) to create exemptions, the delegation "does not substantively except any communications" and therefore "is not facially or inherently content-based." <u>Id.</u> After all, "there are content-neutral ways for the FCC to implement [the delegation], including relationship-based exceptions." <u>Id.</u> Furthermore, that Congress delegated authority to the FCC to make exemptions does not prove that the TCPA is underinclusive. <u>See</u> <u>Mejia</u>, 2017 WL 3278926, at *15; <u>Brickman</u>, 230 F. Supp. 3d at 1045. Indeed, Congress's delegation directs that the FCC "<u>shall</u> consider prescribing regulations" which would tend to increase privacy protections, and that the FCC "<u>may</u>" write exemptions from the autodialing ban, but only if those exemptions "will not adversely affect the privacy rights that this section is intended to protect." <u>See</u> 47 U.S.C. § 227(b)(2)(A)-(B) (emphasis added). Accordingly, the court rejects plaintiffs' argument that the TCPA is underinclusive. <u>See</u> <u>Gallion</u>, 2018 WL 1135386, at *6-7; <u>Mejia</u>, 2017 WL 3278926, at *17; <u>Holt</u>, 240 F. Supp. 3d at 1033-34; <u>Brickman</u>, 230 F. Supp. 3d at 1046-48.

As for overinclusiveness, speech restrictions may not be "overinclusive by unnecessarily circumscribing protected expression." <u>Cahaly</u>, 796 F.3d at 405 (quotation and alteration omitted); <u>see</u> <u>Republican Party of Minn.</u>, 536 U.S. at 775. In <u>Cahaly</u>, the Fourth Circuit analyzed a South Carolina statute regulating automated telephone calls. <u>Cahaly</u>, 796 F.3d at 402. The South Carolina statute placed different restrictions on such robocalls depending on whether the calls were unsolicited

40a

and made for consumer, political, or other purposes. Id.   The South Carolina statute applied "to calls with a consumer or political message but [did] not reach calls made for any other purpose."   Id. at 405.   The Fourth Circuit held that the South Carolina statute was "overinclusive" in that "[c]omplaint statistics show that unwanted commercial calls are a far bigger problem than unsolicited calls from political or charitable organizations."   Id. (quotation omitted).

Plaintiffs cite Cahaly and argue that the TCPA is similarly overinclusive.   See [D.E. 31] 20-21.   The South Carolina statute at issue in Cahaly, however, is distinguishable from 47 U.S.C. § 227(b)(1)(A)(iii).   "Evidence compiled by Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy."   Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243 § 2(10) (1991).   Moreover, unlike the South Carolina statute at issue in Cahaly, "the TCPA is quite limited in what it prohibits."   Brickman, 230 F. Supp. 3d at 1048.   "[T]he TCPA does not restrict individuals from receiving any content they want to receive—speech that would otherwise be prohibited by the TCPA is immediately removed from the purview of the statute once express consent is provided."   Id.; see Greenley, 271 F. Supp. 3d at 1150-51; Holt, 240 F. Supp. 3d at 1034.   Thus, the court rejects plaintiffs' argument that the TCPA is overinclusive.

Finally, plaintiffs argue that there are a host of "less restrictive alternatives" to 47 U.S.C. § 227(b)(1)(A)(iii) that would allow Congress to achieve the legitimate purpose that it enacted the TCPA to serve.   In support,

41a

plaintiffs cite the Fourth Circuit's discussion in <u>Cahaly</u> of time-of-day limitations, mandatory disclosure of a caller's identity, and do not call lists.   <u>See</u> <u>Cahaly</u>, 796 F.3d at 405.

"If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative."   <u>United States v. Playboy Entm't Grp., Inc.</u>, 529 U.S. 803, 813 (2000); <u>see</u> <u>Cahaly</u>, 796 F.3d at 405. However, these alternatives must "be at least as effective in achieving the legitimate purpose that [the] statute was enacted to serve."   <u>Gallion</u>, 2018 WL 1135386, at *7 (quotation omitted); <u>cf.</u> <u>Reno v. ACLU</u>, 521 U.S. 844, 874 (1997).

Unlike the alternative applicable to the South Carolina statute at issue in <u>Cahaly</u>, plaintiffs alternatives would not "be at least as effective in achieving the legitimate purpose" that Congress enacted the TCPA to serve.   <u>Reno</u>, 521 U.S. at 874.   "Time-of-day limitations would not achieve the same privacy objectives because even though such a restriction may designate the span of time in which callers can intrude on an individual's privacy, it would also designate a time for intrusive phone calls."   <u>Brickman</u>, 230 F. Supp. 3d at 1048; <u>see</u> <u>Gallion</u>, 2018 WL 1135386, at *7; <u>Greenley</u>, 271 F. Supp. 3d at 1151; <u>Mejia</u>, 2017 WL 3278926, at *17; <u>Holt</u>, 240 F. Supp. 3d at 1034.   Likewise, "[m]andatory disclosure of a caller's identity and disconnection requirements would also not be as effective in achieving residential privacy because these would not prevent the privacy intrusion from the phone call in the first place."   <u>Brickman</u>, 230 F. Supp. 3d at 1048-49; <u>see</u> <u>Gallion</u>, 2018 WL 1135386, at *7; <u>Greenley</u>, 271 F. Supp. 3d at 1151; <u>Mejia</u>, 2017 WL 3278926, at *17; <u>Holt</u>, 240 F. Supp. 3d

42a

at 1034.   Similarly, "[d]o-not-call lists would also not be a plausible less restrictive alternative because placing the burden on consumers to opt-out of intrusive calls, rather than requiring consumers to opt-in, would obviously not be as effective in achieving residential privacy."   Brickman, 230 F. Supp. 3d at 1049; see Gallion, 2018 WL 1135386, at *7; Greenley, 271 F. Supp. 3d at 1151; Mejia, 2017 WL 3278926, at *17; Holt, 240 F. Supp. 3d at 1034.   Thus, the court rejects plaintiffs' argument concerning less restrictive alternatives.

## IV.

In sum, the court GRANTS defendants' motion for summary judgment [D.E. 34] and DENIES plaintiffs' motion for summary judgment [D.E. 30].   The clerk shall close the case.

SO ORDERED.   This [24] day of Mar. 2018.

/s/   JAMES C. DEVER III

JAMES C. DEVER III
Chief United States District Judge

43a

**APPENDIX C**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

––––––––––

No. 5:16-CV-252-D

AMERICAN ASSOCIATION OF POLITICAL CONSULTANTS,
INC., DEMOCRATIC PARTY OF OREGON, INC.,
PUBLIC POLICY POLLING, LLC, TEA PARTY FORWARD
PAC, AND WASHINGTON STATE DEMOCRATIC CENTRAL
COMMITTEE, PLAINTIFFS

*v.*

JEFFERSON SESSIONS, IN HIS OFFICIAL CAPACITY
AS ATTORNEY GENERAL OF THE UNITED STATES,
AND FEDERAL COMMUNICATIONS COMMISSION,
A FEDERAL AGENCY, DEFENDANTS

––––––––––

Filed:   Mar. 15, 2017

––––––––––

**ORDER**

––––––––––

On May 12, 2016, the American Association of Political Consultants, Inc., the Democratic Party of Oregon, Inc., Public Policy Polling, LLC, the Tea Party Forward PAC, and the Washington State Democratic Central Committee (collectively, "plaintiffs") sued United States Attorney General Loretta Lynch in her official capacity and the Federal Communications Commission ("the

44a

FCC") (collectively, "defendants") [D.E. 1].[1]   On July 15, 2016, Loretta Lynch moved to dismiss plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction [D.E. 15].

On August 5, 2016, plaintiffs amended their complaint [D.E. 18].   Thus, defendants' motion to dismiss plaintiffs' original complaint is denied as moot.

On September 2, 2016, defendants moved to dismiss plaintiffs' amended complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction [D.E. 22] and filed a memorandum in support [D.E. 23].   On September 23, 2016, plaintiffs responded [D.E. 23].   On October 7, 2016, defendants replied [D.E. 25].   As explained below, the court denies defendants' motion to dismiss.

Plaintiffs' amended complaint challenges the prohibition in 47 U.S.C. § 227(b)(1)(A)(iii) against certain automatically dialed phone calls ("the autodialing ban") because the prohibition is both a content-based restriction on protected speech and unconstitutionally underinclusive.   See Am. Compl. [D.E. 18] ¶¶ 2, 36-63.   The autodialing ban prohibits "mak[ing] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice   . . .   to any telephone number assigned to a   . . .   cellular telephone service   . . . unless such call is made solely to collect a debt owed to or guaranteed by the United States."   47 U.S.C.

---

[1] On February 19, 2017, Jefferson Sessions assumed the position of Attorney General of the United States.   A public officer's "successor is automatically substituted as a party."   Fed. R. Civ. P. 25(d).

45a

§ 227(b)(1)(A), (b)(1)(A)(iii).  The FCC is empowered
to "prescribe regulations to implement" 47 U.S.C.
§ 227(b).  <u>See</u> <u>id.</u> § 227(b)(2).  In support of their argu-
ment that the autodialing ban is unconstitutional, plain-
tiffs cite exemptions from the ban, created by statute
and FCC orders, they claim are content-based.   Am.
Compl. ¶¶ 22, 28-35.   The statutory exemptions include
calls made for emergency purposes, calls made with the
express consent of the called party, or calls made to col-
lect a debt owed to or guaranteed by the United States.
<u>See</u> 47 U.S.C. § 227(b)(1)(A), (b)(1)(A)(iii).   The FCC's
regulatory exemptions include uncharged calls from a
wireless carrier to its customer, uncharged package de-
livery notifications, non-telemarketing communications
where a third party has represented to the sender that
the recipient has consented to the communications,
emergency calls related to healthcare, certain calls re-
lated to identity theft, and calls from federal govern-
ment officials conducting official business.   <u>See</u> Tele-
phone Consumer Protection Act of 1991, 77 Fed. Reg.
34233, 34235 (June 11, 2012) (exempting wireless carri-
ers); <u>In the Matter of Cargo Airline Assoc. Petition for
Expedited Declaratory Ruling</u>, 29 FCC Rcd. 3432, 3439
(Mar. 27, 2014) (exempting package delivery notifica-
tions); <u>In the Matter of GroupMe. Inc./Skype Commc'ns
S.A.R.L.</u>, 29 FCC Rcd. 3442, 3444 (Mar. 27, 2014) (ex-
emption for third-party representation of consent); <u>In
re Rules and Regulations Implementing the Tel. Con-
sumer Prot. Act. of 1991</u>, 30 FCC Rcd. 7961, 8023-24,
8031 (Ju1y 10, 2015) (exempting certain calls related to
healthcare and identity theft); <u>In re Rules and Regula-
tions Implementing the Tel. Consumer Prot. Act of</u>

46a

<u>1991</u>, CG Docket No. 02-278 ¶ 12 (Ju1y 5, 2016) (exempting calls made by federal officials conducting official business).

Defendants move to dismiss plaintiffs's amended complaint for lack of subject-matter jurisdiction and make two arguments.   First, defendants argue that this case falls within the exclusive jurisdiction of the federal court of appeals.   Second, defendants argue that plaintiffs lack standing because a favorable decision in this court could not redress plaintiffs' injuries.

Under 47 U.S.C. § 402(a), "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the [FCC] under this chapter   .  .  .   shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28," subject to some exceptions that do not apply in this case.   Section 402(a) directs the court to 28 U.S.C. § 2342, which states that "[t]he court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part) or to determine the validity of   .  .  .   all final orders of the Federal Communications Commission made reviewable by" 47 U.S.C. § 402(a).

Plaintiffs do not seek to enjoin, set aside, annul, or suspend any order of the FCC.   Rather, plaintiffs challenge the autodialing ban in 42 U.S.C. § 277(b)(1)(A)(iii), which the FCC has interpreted and to which the FCC has defined exceptions.   Although plaintiffs may argue at a later stage of this case that the FCC's orders are evidence showing the autodialing ban is content-based, they do not seek to show that the FCC's orders delineating or interpreting exceptions to the autodialing ban are void or invalid.   Merely referencing FCC orders

47a

does not make the present proceeding one to enjoin, set aside, annul, or suspend those orders within the meaning of 47 U.S.C. § 402(a).   Moreover, the FCC's orders carving out exemptions to the autodialing ban would not be affected by the relief plaintiffs seek.   Plaintiffs seek to invalidate the autodialing ban in 42 U.S.C. § 277(b)(1)(A)(iii).   The FCC's orders carve out exemptions to the autodialing ban.   If the plaintiffs obtain the relief they seek in this action, the exemptions set out in the FCC's orders will be rendered unnecessary, but they will not be enjoined, set aside, annulled, or suspended.   Thus, the court rejects defendants' first argument.

As for the question of redressability, defendants argue that plaintiffs' injuries are not redressable because even if the court were to find that the autodialing ban is unconstitutional, the court would have to sever the exemptions from the ban, in which case plaintiffs would still be prohibited from sending automatic messages to cellular telephones.   The United States Court of Appeals for the Fourth Circuit, however, took the opposite approach in Cahaly v. Larosa, 796 F.3d 399, 402-06 (4th Cir. 2015).   In Cahaly, the Fourth Circuit considered a constitutional challenge to South Carolina's anti-robocall statute, which banned automated telephone calls delivering prerecorded messages for consumer or political purposes but also carved out three exceptions based on the express or implied consent of the called party.   Id. at 402.   The Fourth Circuit held that the robocall ban was a content-based restriction that was unconstitutional because it could not survive strict scrutiny.   Id. at 405-06.   The Fourth Circuit did not sever the general ban from its exceptions.   Rather, the

48a

Fourth Circuit affirmed the district court's order declaring the robocall statute unconstitutional and barring its enforcement. <u>Id.</u> at 404-06. Here, the question of plaintiffs' success on the merits and the appropriate relief is a question for another day, but as a matter of standing, this court does not lack the power to grant plaintiffs the relief they seek.

In sum, pursuant to Fed. R. Civ. P. 25(d), the court ORDERS that Jefferson Sessions in his official capacity as Attorney General of the United States, be substituted for Loretta Lynch in her official capacity as Attorney General of the United States. Defendants' motion to dismiss plaintiffs' initial complaint for lack of subject-matter jurisdiction [D.E. 15] is DENIED as moot. Defendants' motion to dismiss plaintiffs' amended complaint for lack of subject-matter jurisdiction [D.E. 22] is DENIED.

SO ORDERED. This [15] day of Mar. 2017.


/s/ <u>JAMES C. DEVER III</u>
JAMES C. DEVER III
Chief United States District Judge

49a

**APPENDIX D**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————

No. 18-1588
(5:16-cv-00252-D)

AMERICAN ASSOCIATION OF POLITICAL CONSULTANTS,
INC.; DEMOCRATIC PARTY OF OREGON, INC.;
PUBLIC POLICY POLLING, LLC; WASHINGTON STATE
DEMOCRATIC CENTRAL COMMITTEE,
PLAINTIFFS-APPELLANTS
AND
TEA PARTY FORWARD PAC, PLAINTIFF

*v.*

FEDERAL COMMUNICATIONS COMMISSION;
WILLIAM P. BARR, IN HIS OFFICIAL CAPACITY
AS ATTORNEY GENERAL OF THE UNITED STATES,
DEFENDANTS-APPELLEES

————

Filed:   June 21, 2019

————

**ORDER**

————

The petitions for rehearing en banc were circulated to the full court.    No judge requested a poll under Fed. R. App. P. 35.   The court denies the petitions for rehearing en banc.

For the Court

/s/   <u>PATRICIA S. CONNOR, Clerk</u>

50a

# APPENDIX E

47 U.S.C. 227(a)-(b) (2012 & Supp. V 2017) provides:

**Restrictions on use of telephone equipment**

**(a)   Definitions**

As used in this section—

(1)   The term "automatic telephone dialing system" means equipment which has the capacity—

(A)   to store or produce telephone numbers to be called, using a random or sequential number generator; and

(B)   to dial such numbers.

(2)   The term "established business relationship", for purposes only of subsection (b)(1)(C)(i) of this section, shall have the meaning given the term in section 64.1200 of title 47, Code of Federal Regulations, as in effect on January 1, 2003, except that—

(A)   such term shall include a relationship between a person or entity and a business subscriber subject to the same terms applicable under such section to a relationship between a person or entity and a residential subscriber; and

(B)   an established business relationship shall be subject to any time limitation established pursuant to paragraph (2)(G)).[1]

---

[1]   So in original.   Second closing parenthesis probably should not appear.

51a

(3)   The term "telephone facsimile machine" means equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.

(4)   The term "telephone solicitation" means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message (A) to any person with that person's prior express invitation or permission, (B) to any person with whom the caller has an established business relationship, or (C) by a tax exempt nonprofit organization.

(5)   The term "unsolicited advertisement" means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise.

**(b)   Restrictions on use of automated telephone equipment**

**(1)   Prohibitions**

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—

(A)   to make any call (other than a call made for emergency purposes or made with the prior ex-

52a

press consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—

> (i)   to any emergency telephone line (including any "911" line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency);

> (ii)   to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

> (iii)   to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States;

(B)   to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order by the Commission under paragraph (2)(B);

(C)   to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement, unless—

53a

(i)    the unsolicited advertisement is from a sender with an established business relationship with the recipient;

(ii)   the sender obtained the number of the telephone facsimile machine through—

(I)    the voluntary communication of such number, within the context of such established business relationship, from the recipient of the unsolicited advertisement, or

(II)   a directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its facsimile number for public distribution,

except that this clause shall not apply in the case of an unsolicited advertisement that is sent based on an established business relationship with the recipient that was in existence before July 9, 2005, if the sender possessed the facsimile machine number of the recipient before July 9, 2005; and

(iii)  the unsolicited advertisement contains a notice meeting the requirements under paragraph (2)(D),

except that the exception under clauses (i) and (ii) shall not apply with respect to an unsolicited advertisement sent to a telephone facsimile machine by a sender to whom a request has been made not to send future unsolicited advertisements to such telephone facsimile machine that complies with the requirements under paragraph (2)(E); or

54a

(D)  to use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously.

**(2)  Regulations; exemptions and other provisions**

The Commission shall prescribe regulations to implement the requirements of this subsection.   In implementing the requirements of this subsection, the Commission—

(A)  shall consider prescribing regulations to allow businesses to avoid receiving calls made using an artificial or prerecorded voice to which they have not given their prior express consent;

(B)  may, by rule or order, exempt from the requirements of paragraph (1)(B) of this subsection, subject to such conditions as the Commission may prescribe—

(i)   calls that are not made for a commercial purpose; and

(ii)  such classes or categories of calls made for commercial purposes as the Commission determines—

(I)   will not adversely affect the privacy rights that this section is intended to protect; and

(II)  do not include the transmission of any unsolicited advertisement;

55a

(C)   may, by rule or order, exempt from the requirements of paragraph (1)(A)(iii) of this subsection calls to a telephone number assigned to a cellular telephone service that are not charged to the called party, subject to such conditions as the Commission may prescribe as necessary in the interest of the privacy rights this section is intended to protect;

(D)   shall provide that a notice contained in an unsolicited advertisement complies with the requirements under this subparagraph only if—

(i)   the notice is clear and conspicuous and on the first page of the unsolicited advertisement;

(ii)   the notice states that the recipient may make a request to the sender of the unsolicited advertisement not to send any future unsolicited advertisements to a telephone facsimile machine or machines and that failure to comply, within the shortest reasonable time, as determined by the Commission, with such a request meeting the requirements under subparagraph (E) is unlawful;

(iii)  the notice sets forth the requirements for a request under subparagraph (E);

(iv)   the notice includes—

(I)    a domestic contact telephone and facsimile machine number for the recipient to transmit such a request to the sender; and

(II)   a cost-free mechanism for a recipient to transmit a request pursuant to such notice

56a

to the sender of the unsolicited advertisement; the Commission shall by rule require the sender to provide such a mechanism and may, in the discretion of the Commission and subject to such conditions as the Commission may prescribe, exempt certain classes of small business senders, but only if the Commission determines that the costs to such class are unduly burdensome given the revenues generated by such small businesses;

(v)   the telephone and facsimile machine numbers and the cost-free mechanism set forth pursuant to clause (iv) permit an individual or business to make such a request at any time on any day of the week; and

(vi)   the notice complies with the requirements of subsection (d);

(E)   shall provide, by rule, that a request not to send future unsolicited advertisements to a telephone facsimile machine complies with the requirements under this subparagraph only if—

(i)   the request identifies the telephone number or numbers of the telephone facsimile machine or machines to which the request relates;

(ii)   the request is made to the telephone or facsimile number of the sender of such an unsolicited advertisement provided pursuant to subparagraph (D)(iv) or by any other method of communication as determined by the Commission; and

57a

(iii)  the person making the request has not, subsequent to such request, provided express invitation or permission to the sender, in writing or otherwise, to send such advertisements to such person at such telephone facsimile machine;

(F)  may, in the discretion of the Commission and subject to such conditions as the Commission may prescribe, allow professional or trade associations that are tax-exempt nonprofit organizations to send unsolicited advertisements to their members in furtherance of the association's tax-exempt purpose that do not contain the notice required by paragraph (1)(C)(iii), except that the Commission may take action under this subparagraph only—

(i)  by regulation issued after public notice and opportunity for public comment; and

(ii)  if the Commission determines that such notice required by paragraph (1)(C)(iii) is not necessary to protect the ability of the members of such associations to stop such associations from sending any future unsolicited advertisements;

(G)(i)  may, consistent with clause (ii), limit the duration of the existence of an established business relationship, however, before establishing any such limits, the Commission shall—

(I)  determine whether the existence of the exception under paragraph (1)(C) relating to an established business relationship has resulted

58a

in a significant number of complaints to the Commission regarding the sending of unsolicited advertisements to telephone facsimile machines;

(II)   determine whether a significant number of any such complaints involve unsolicited advertisements that were sent on the basis of an established business relationship that was longer in duration than the Commission believes is consistent with the reasonable expectations of consumers;

(III)   evaluate the costs to senders of demonstrating the existence of an established business relationship within a specified period of time and the benefits to recipients of establishing a limitation on such established business relationship; and

(IV)   determine whether with respect to small businesses, the costs would not be unduly burdensome; and

(ii)   may not commence a proceeding to determine whether to limit the duration of the existence of an established business relationship before the expiration of the 3-month period that begins on July 9, 2005; and

(H)   may restrict or limit the number and duration of calls made to a telephone number assigned to a cellular telephone service to collect a debt owed to or guaranteed by the United States.

59a

**(3)   Private right of action**

A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State—

(A)   an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,

(B)   an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

(C)   both such actions.

If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.